UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

ANDREW CASIAS and ERNEST CASIAS,
on behalf of themselves and similarly-
situated employees of Distribution
Management Corporation, Inc.,

        Plaintiffs,

v.                                          Civ. No. 11-00874 MV/RHS

DISTRIBUTION MANAGEMENT
CORPORATION, INC.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Distribution Management Corporation, Inc.'s ("DMC") Motion for Summary Judgment and Supporting Memorandum ("Motion for Summary Judgment") [Doc. 43]. The Court, having considered the motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion for Summary Judgment is not well taken and will be DENIED.

## BACKGROUND[1]

Defendant DMC is a motor carrier operating under the authority of the Federal Motor Carrier Safety Administration, with its principal business located in New Mexico. *See* Declr. of Stephen Griego [Doc. 44] ("Griego Declr."), ¶ 3. Defendant DMC provides logistics services for its customers throughout the Southwest United States. *See id.* ¶ 4. As part of these services, DMC coordinates same- and next-day package pick-up and delivery. *See id.* ¶ 5.

Defendant contracts with drivers, including Plaintiffs Ernest Casias and Andrew Casias, to

---

[1] Except where otherwise noted, the following facts are undisputed.

1

provide its delivery services. *See id.* ¶ 5. Defendant DMC entered into a contract with Plaintiff Ernest Casias entitled "Independent Contractor Agreement" on September 27, 2009, and an agreement entitled "Subcontractor Agreement" on October 15, 2010.[2] *See id.* ¶¶ 6, 8; *id.* Exh. 1, Independent Contractor Agreement ("E. Casias IC Agr."), at 1; *id.* Exh. 3, Subcontractor Agreement, at 1. Defendant DMC entered into a contract with Plaintiff Andrew Casias entitled "Independent Contractor Agreement" on November 10, 2009. *See id.* ¶ 7; *id.* Exh. 2, Independent Contractor Agreement ("A. Casias IC Agr."), at 1.

The foregoing agreements require Plaintiffs to be consistent with their on-time delivery performance, *see id.* ¶ 3.04; E. Casias IC Agr., ¶ 3.04; Subcontractor Agr., ¶ 2(i), and they require Plaintiffs to maintain various types of insurance, *see id.* ¶ 3; E. Casias IC Agr., ¶¶ 3.07, 3.09; A. Casias IC Agr., ¶¶ 3.07, 3.09. The independent contractor agreements further provide that Plaintiffs agree not to allow other persons or animals to ride in the equipment while making deliveries for DMC, *see id.* ¶ 3.08; E. Casias IC Agr. ¶ 3.08, and that Plaintiffs agree to furnish cell phones at their own expense for communication with DMC, *see id.* ¶ 3.08; A. Casias IC Agr. ¶ 3.08. The Subcontractor Agreement additionally provides that Ernest Casias "agrees to count and verify all freight against the freight bill (or manifest) and to obtain proper signatures receipting for the delivery of the freight." Subcontractor Agr. ¶ 2(a).

In his declaration, Stephen Griego, an executive employed by Defendant DMC who has access to Plaintiffs' driving records, attests that "[i]n exchange for the services provided, Ernest

---

[2] Although Defendant DMC contends that it hires drivers who are independent contractors, the parties dispute whether Plaintiffs and these drivers are in fact independent contractors within the meaning of the New Mexico Minimum Wage Act ("Wage Act"), N.M. Stat. Ann. §§ 50-4-19-30. That dispute, however, is not relevant to the Motion for Summary Judgment, because for purposes of its summary judgment motion only, Defendant assumes that Plaintiffs are "employees" within the meaning of the Wage Act. *See* Mot. for Summ. J. at 2.

Casias and Andrew Casias were always compensated on a flat rate and/or piece rate basis." Griego Declr. ¶ 10; *see also id.* ¶ 15. Plaintiffs do not dispute that their compensation is fixed according to the routes they service. S*ee* Resp. to Mot. for Summ. J., Exh. 1, Declr. of Ernest Casias ("Declr. of E. Casias"), ¶2 ("[i]t is true that my weekly compensation is fixed according to the routes I service").

Defendant DMC paid Plaintiffs a flat rate for scheduled runs, "specials," and on-call deliveries. *See* Griego Declr., ¶¶ 16, 20; *id.,* Exh. 6, Oct. 2009 Statement of Work. "Specials" are ordered by the customer and usually consist of a one-time delivery at a rate negotiated by DMC. *See id.* ¶ 16. "On-call" pick-ups or deliveries are offered to drivers prior to or during their scheduled routes. *See id.* ¶ 20. The most common compensation system for Plaintiffs involved negotiated rates for miles driven and stops made for each pick-up and delivery. *See id.* ¶ 17.

In support of its Motion for Summary Judgment, DMC identifies various invoices demonstrating the compensation and fee structure between DMC and Plaintiffs. Specifically, DMC presents three invoices from Plaintiff Ernest Casias for the billing period of August 8, 2011, to August 21, 2011, for deliveries made by Plaintiff personally and for deliveries made by the drivers he independently hired. The first invoice from that period lists "Scheduled Runs" to nineteen different customers that occurred daily on each of the ten weekdays during the invoice period. The total amount billed for scheduled runs was based upon (1) a fee of either $2.50 or $4.00 per run to any given customer, which fee was then multiplied by ten (the number of daily runs taken for that customer during the invoice period), and (2) a daily mileage fee determined per mile traveled, which was then multiplied by ten (the number of days runs were made). *See id.*, Exh. 4, 8-8 to 8-21-11 Invoice of E. Casias, at 1. The invoice also establishes that Plaintiff billed DMC a fee of $2.50 or in one instance $6.00 for each of the 33 "On Call and Special" runs made

during the invoice period, as well as an additional mileage fee for each mile traveled.  *See id.* at 1-2.  Plaintiff Ernest Casias's two other invoices during that period reflect a similar billing structure, with the only variance being attributable to a change in the number of runs made, the amount of the fixed fee charged for each of the runs (either $2.50 or $4.00), and the number of miles traveled.  *See id.* at 3-5.

An October 2009 Statement of Work indicates that Plaintiff Ernest Casias and DMC agreed that DMC would pay Casias a fixed fee of $222.00 for the Tucumcari Route.  *See id.*, Exh. 6, Oct. 2009 Statement of Work.  Ernest Casias's invoice for the period from September 21, 2009, to October 4, 2009, indicates that Casias billed DMC at the fixed daily rate of $222.00 for the Tucumcari Route, which, over three days totaled $666.00, as well as a fixed fee for each of the nine special and on call runs made.  *See id.*, Exh. 7, 9-9 to 10-04-09 Invoice of E. Casias.

Plaintiff Andrew Casias has undertaken two consistent scheduled routes for DMC.  *See id.*, ¶ 19.  Invoices for Andrew Casias from August 8 to August 21, 2011, and from August 9 to August 22, 2010, reflect a billing structure akin to that described for Ernest Casias based upon a fixed fee for each scheduled run, a mileage fee based upon each mile traveled, and a fixed fee for each on call or special run made.  *See id.*, Exh. 5, 8-8 to 8-21-11 Invoice of A. Casias, at 1-2; *id.*, Exh. 9, 8-9 to 8-22-10 Invoice of A. Casias, at 1-6.

Plaintiffs present evidence that on average they were required to wait approximately four to four-and-one-half hours per day between scheduled deliveries.  *See* Declr. of E. Casias, ¶ 18.  During this wait time, Plaintiff's evidence suggests that Defendant DMC did not allow Plaintiffs to leave the customer drop-off or pick-up location, even to use the restroom or eat, without calling in and confirming authorization from dispatch.  *See id.*, Attachment C.  Furthermore, DMC did not allow Plaintiff Casias or his drivers to use the restroom at the same fueling station, restaurant, or

convenience store more than one time per week.  *See id.*; Resp. to Mot. for Summ. J., Exh. 4, Aff. of Michael Vargas ("Vargas Aff."), ¶ 10 ("DMC issued a memo to independent contractors and employees which directed, under threat of disciplinary action, that no unscheduled breaks, including bathroom breaks, were allowed unless pre-approved by Dispatch").

Plaintiff Ernest Casias attests that on his Tucumcari/Santa Rosa route, Defendant DMC required him to wait one hour and 35 minutes before he could begin his merchandise pick-ups. *See* Declr. of E. Casias, ¶ 14.  Moreover, DMC's route manifest required Ernest Casias to make his last delivery in Tucumcari at Trigg Memorial Hospital at 11:35 a.m., and then wait three hours and 35 minutes, until 3:10 p.m. to make a pick-up at Trigg Memorial Hospital.  *See id.*  Ernest Casias's next 3:45 p.m. pick up at PMS Quay Country Health was five minutes away, thus requiring Casias to wait approximately 25 minutes between the two stops.  *See id.* ¶ 15.  The following pick up at Wells Fargo Bank was scheduled at 4:10 p.m., which was approximately three minutes from PMS Quay Country Health, thus requiring Casias to wait approximately fifteen minutes between stops.  *See id.* ¶ 16.  Furthermore, DMC "always" required, upon threat of taking away a route, Ernest Casias and his drivers to wait for customers to prepare their delivery items, even if the preparation occurred well beyond the pick-up time.  *See id.* ¶ 17.

Defendant DMC additionally required Plaintiff Ernest Casias to wait for scheduled deliveries instead of leaving Tucumcari early to avoid snow storms, despite the fact that Casias or his drivers had arranged with customers to be released early.  On multiple occasions DMC's Operations Manager or Operations Supervisor would threaten Plaintiff Casias's job to prevent Plaintiff, or Plaintiff's drivers, from leaving early.  *See id.*, Attachment A, at 5-6; *id.* at 6-7.  Moreover, on one occasion, DMC's Regional Manager directed Plaintiff Andrew Casias to adjust his route times so he could wait an extra hour to accommodate another driver who had started her

route late due to snow.  *See* Resp. to Mot. for Summ. J., Exh. 2, Declr. of Andrew Casias; Andrew Casias's Answers to Interrogatories [Doc. 48-3], at 6.

In addition, Ernest L. Ulibarri, one of DMC's former drivers, attests that "sometimes" DMC would keep drivers in Albuquerque because roads were closed due to weather, and that on these occasions DMC would require Ulibarri to wait at the DMC facilities for three to four hours while DMC tracked road conditions.  *See* Resp. to Mot. for Summ. J., Exh. 2, Ulibarri Aff., ¶9. DMC would not allow Ulibarri to determine road conditions for himself and would not allow Ulibarri to wait at home for a telephone call from DMC indicating whether to drive a particular route.  *See id*.

Plaintiff Ernest Casias further attests that DMC required the drivers to undertake various pre- and post-delivery duties at the DMC warehouse.  For example, the first duties of any work day took approximately one hour and included arriving at the DMC warehouse, obtaining the route manifest and paperwork, unwrapping the pallets that contained the merchandise, sorting the merchandise according to delivery point, scanning the merchandise, assuring that all pieces were accounted for, and loading the pieces into the truck.  *See* Declr. of E. Casias, ¶¶ 5, 6; Vargas Aff. ¶ 11.  When drivers return to the DMC warehouse at the end of any work day, they must spend approximately fifteen minutes unloading all of the merchandise, scanning the merchandise, unloading their empty totes, and stacking the totes on the pallets.  *See id.* ¶ 19.

Plaintiffs also present evidence that they were required to appear at each delivery and pick-up point at a designated time, that DMC would impose penalties for tardiness, *see* Mot. for Summ. J., Exhs. 6, 8 (setting forth tables of pay penalties); *see also* E. Casias IC Agr. ¶ 3.04; A. Casias IC Agr. ¶ 3.04; Subcontractor Agr. ¶ 2(i); Declr. of E. Casias, ¶¶ 8, 9, and that drivers were required to scan all delivered merchandise in the presence of the customer, *see id.* ¶ 13.   In

addition, Plaintiffs were required to abide by DMC's rules and policies, including, among other things, carrying certain types and amounts of insurance, maintaining a cell phone for possible contact by DMC, and not having passengers or animals in the car while making deliveries.  *See* Declr. of E. Casias, ¶ 11.

## STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted).  The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case."  *Celotex v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).  The nonmoving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998). If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## **DISCUSSION**

Although the New Mexico Minimum Wage Act requires an employer to pay overtime to an "employee," Defendant DMC argues that it is entitled to summary judgment in its favor because the Wage Act excludes from the definition of "employee" those who are compensated upon "piecework" or "flat rate schedules." N.M. Stat. Ann. §§ 50-4-21(C)(5), 50-4-22(D). According to Defendant, the undisputed facts demonstrate that DMC always paid Plaintiffs on a piecework or flat rate basis, thus rendering Plaintiff's overtime claim under the Wage Act deficient and subject to dismissal as a matter of law.

In response, Plaintiffs contend that they were not piecework employees because they were not truly compensated on a piecework or flat-rate basis. Plaintiffs reason that they actually were hourly workers because DMC altered the piecework compensation structure when it required Plaintiffs to wait at customer sites, conduct extra-contractual pre- and post-delivery services, report to work and delivery sites at defined times, scan merchandise in front of customers, comply with DMC policies and procedures, and secure permission from DMC dispatch to leave a site or take a bathroom break. *See* Resp. to Mot. for Summ. J. at 1-2, 15-18.

The Wage Act generally requires employers to pay overtime to employees who work more than 40 hours per week. *See* N.M. Stat. Ann. § 50-4-22(D). The Act, however, contains several exemptions from the definition of "employee." *See id.* § 50-4-21(C). Section 50-4-21(C)(5) of New Mexico Statutes Annotated contains one such exemption relevant to the facts in this case. Specifically, Section 50-4-21(C)(5) provides that the term "employee" includes an individual employed by an employer, "but shall not include salespersons or employees compensated upon piecework, flat rate schedules or commission basis." *Id.* § 50-4-21(C)(5). Exemptions from the New Mexico Minimum Wage Act are strictly and narrowly construed against employers. *See State ex rel. State Labor Comm'r v. Goodwill Indus.*, 478 P.2d 543, 545 (N.M. 1970) (citing *A. H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)). Thus, an employer asserting an exemption defense must prove that the exemption "unmistakably" includes the employee whom the employer claims to be exempt from the Act. *See id.*

The Wage Act does not define the terms "piecework" or "flat rate." The common definition of piecework, however, is "work done by the piece and paid at a set rate per unit." Merriam Webster's Collegiate Dictionary, 938 (2003 11th ed.). The parties do not dispute that Plaintiffs earned a predetermined fixed wage for each individual customer pick-up and delivery. *See* Griego Declr., ¶ 21; *see also* Declr. of E. Casias, ¶ 2. The Court therefore concludes that this fixed rate of payment constitutes a "piecework" or "flat rate" compensation structure within the meaning of Section 50-4-21(C)(5) of the Wage Act. *Cf. Olivo v. Crawford Chevrolet, Inc.*, 799 F. Supp. 2d 1237, 1240-42 (D.N.M. 2011) (recognizing that the plaintiffs' per-car pay component constituted "piecework" compensation).

The Court's inquiry, however, does not end here. Plaintiffs argue that Defendant DMC altered the piecework compensation structure when it required Plaintiffs to engage in duties

9

beyond delivering and picking up customer packages, and that this alteration renders the Wage Act's exemption inapplicable. DMC does not dispute that it required Plaintiffs to undertake additional duties, but rather contends that the piecework structure remained intact because the payment Plaintiffs received compensated them for all of the services they provided to DMC. *See* Griego Declr., ¶ 21.

There is a dearth of case law interpreting the "piecework, flat rate or commission basis" exemption set forth in Section 50-4-21(C)(5) of the Wage Act. *See Olivo*, 799 F. Supp. 2d at 1240-42 ("[a] sedulous search by the parties and this Court reveals that no other court has addressed the issue of who is properly considered a flat rate or piecework employee under N.M.S.A. § 50-4-21(C)(5)"). The only case construing this exemption identified by the parties or located by this Court is *Olivo v. Crawford Chevrolet, Inc*. *See id.* In *Olivo*, the court rejected the defendant-employer's argument that the plaintiff-mechanics were not employees within the meaning of the Wage Act because the mechanics were paid pursuant to a piecework compensation structure. *See id.* at 1242  The *Olivo* court recognized the compensation scheme was piecework because the employer paid its autobody employees by the job, *see id.* at 1242, but ultimately concluded that the employees had presented evidence that their employer altered that compensation structure when it required the employees to wait approximately ten to fifteen hours per week at the autobody shop without pay for additional assignments, *see id.* at 1239-40.

The defendant-employer in *Olivo* conceded (as here) that the plaintiff-mechanics were required to wait but argued that the piecework payment scheme remained intact because the plaintiffs' pay for completed assignments "was understood by all" to compensate for waiting time. *See id.* at 1240. Likewise, the *Olivo* plaintiff-employees contended (as here) that they were not truly paid on a piecework or flat rate basis because they were not allowed to leave the employer's

10

premises in between assignments. *See id.* at 1242. The *Olivo* court explained that the plaintiffs effectively were arguing that their employer altered their piecework employee status by compelling them to remain on the premises even when no assignments were available. *See id.*

The *Olivo* court ultimately found the plaintiffs' argument compelling. The court explained that although the plaintiffs were paid on a piecework basis, "the fact that [the d]efendants compelled [the p]laintiffs to remain on the premises at least some of the occasions when no assignments were available changes the analysis." *Id.* The court reasoned that "[s]uch waiting time can only be for the benefit of the employer, by having workers at their disposal when jobs arise." *Id.* (citing *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) (finding that "readiness to serve may be hired, quite as much as service itself, and time spent lying in wait . . . may be treated by the parties as a benefit to the employer"). The court explained that this wait time was in fact work, for although the plaintiffs "might have been able to read magazines and such," "they were not able to "use time effectively for [their] own purpose[s]." *Id.* (citation omitted). Thus, in denying the employer's motion for summary judgment, the *Olivo* court held that "there remains a material question of fact as to whether Plaintiffs are 'piecework' employees under the [Wage Act] and therefore precluded from recovering under that statute." *Id.*

The Court finds the reasoning of *Olivo* persuasive. At this stage in the litigation, the Court must tip the scales in favor of Plaintiffs as the parties opposing summary judgment. *Cf. Kaus v. Standard Ins. Co.*, 985 F. Supp. 1277, 1281 (D. Kan. 1997). Moreover, the Court is required to construe the Section 50-4-21(C)(5) exemption to the Wage Act narrowly and cannot grant summary judgment in Defendant's favor unless the exemption "unmistakably" includes Plaintiffs. *Cf. State ex rel. State Labor Comm'r*, 478 P.2d at 545 (citation omitted). Consistent with these principles, the Court concludes that Plaintiffs have pointed to evidence sufficient to create a factual

question with respect to whether Defendant altered the piecework compensation structure and removed them from the Wage Act exemption.

Specifically, Plaintiffs have presented evidence that DMC required them to spend an average of in excess of twenty hours per week waiting between scheduled deliveries. The evidence also indicates that Plaintiffs and their drivers were required to wait for customers to prepare their delivery items even if it was well beyond the pick-up time, to wait for scheduled deliveries instead of leaving early to avoid snow storms despite the fact that individual customers agreed to release Plaintiffs early, and to wait at the DMC facility for three to four hours while DMC tracked road conditions and decided whether drivers should undertake their routes. Plaintiffs' evidence further indicates that while Plaintiffs were waiting up to three or four hours before they undertook their next run, Plaintiffs and their drivers were required to remain at the pick-up or delivery site. *See supra* p. 4-5.

Although the Court already has concluded that Plaintiffs were paid on a piecework basis because their compensation was fixed according to the routes they serviced, *see* Declr. of E. Casias, ¶ 2, the fact that Plaintiffs have presented evidence that Defendant DMC compelled them to spend in excess of twenty hours per week waiting at customer pick-up and delivery locations changes the piecework payment structure. *Cf. Olivo*, 799 F. Supp. 2d at 1242 (employer changed piecework compensation structure by requiring employees to wait without pay between ten to fifteen hours per week on the employer's premises for additional assignments). As the *Olivo* court explained, this waiting time was only for the benefit of the employer.[3] *Cf. id.*; *see also*

---

[3] In *Olivo*, the court reasoned that the waiting time was for the benefit of the employer, because the employer had "workers at [its] disposal when jobs ar[o]se." 799 F. Supp. 2d at 1242 (citation omitted). The evidence here does not specifically indicate what benefit DMC received by requiring its workers to remain in wait at customer sites *in between* scheduled delivery routes.

*Armour*, 323 U.S. at 13 ("readiness to serve may be hired, . . . and time spent lying in wait . . . may be treated by the parties as a benefit to the employer"). Plaintiffs' presented evidence that, when construed in Plaintiffs' favor, indicates that the time in between scheduled runs was not their own because they were required to remain in wait at customer sites, they not allowed to leave the pick-up or drop-off locations without DMC's authorization, and they could not take bathroom breaks without DMC's approval. *Cf. Olivo*, 799 F. Supp. 2d at 1242 (construing wait time as work because the plaintiffs were not able to "use [the] time effectively for [their] own purpose[s]"). Thus, because this waiting time between scheduled runs was for the benefit of DMC, there remains a material question of fact as to whether Plaintiffs were "piecework" employees under the Wage Act precluded from recovering under the statute. *Cf. id.*

Defendant DMC argues that *Olivo* is distinguishable because the *Olivo* employer required its employees to remain in wait at the employer's premises even when no assignments were available. *See* Reply in Support of Mot. for Summ. J. at 7 (citing *Olivo*, 799 F. Supp. 2d at 1242). To the extent Defendants contend that *Olivo* is distinguishable because Plaintiffs were not required to remain on DMC's physical premises, the Court concludes that requiring Plaintiffs to remain at a customer pick-up or delivery site is the functional equivalent of requiring them to wait at DMC's facility. It simply happens that Plaintiffs conduct their work at customer sites, whereas the plaintiff-mechanics in *Olivo* conducted their work at the autobody facility.

To the extent Defendants content that *Olivo* is distinguishable because the

---

Construing the facts and drawing all reasonable inferences in Plaintiffs favor, however, the Court assumes that requiring Plaintiffs to remain at customer sites while waiting up to several hours between runs was for the benefit of DMC. *Cf. id.* A reasonable fact finder could infer, for example, that Defendant DMC required Plaintiffs to remain at customer sites between scheduled runs so that DMC could stay in close contact with Plaintiffs in the event that a customer needed an unscheduled pick-up or another "on-call" run became available.

plaintiff-mechanics were required to remain in wait when they had no guarantee of additional assignments, whereas the Plaintiffs here waited to undertake already scheduled routes, the Court does not find this argument compelling for several reasons. First, as previously discussed, the evidence construed in Plaintiffs' favor indicates that DMC "sometimes" required its drivers to remain at DMC's facility for hours while waiting for DMC to determine whether DMC would send the drivers on a their routes or whether DMC would cancel the routes due to inclement weather. *See supra* p. 6. Thus, on these occasions, drivers were required to wait on the premises even though DMC might ultimately determine the drivers had no work. Thus, like the plaintiff-mechanics in *Olivo*, the DMC drivers were waiting for their employer's benefit so that DMC would have the drivers ready in the event that DMC determined the routes should be driven. *Cf. Olivo*, 799 F. Supp. at 1242 (construing wait time as "work" because the time benefited the employer who had "workers at [its] disposal when jobs ar[o]se").

Second, Plaintiffs have presented evidence that Defendant DMC required Plaintiffs to remain at customer sites during inclement weather, despite the fact that Plaintiffs had secured permission from the customers to leave early and no further pick-ups or deliveries therefore were pending. *See supra* p. 5-6. Thus, under these circumstances, Defendant DMC required Plaintiffs to wait despite the fact that Plaintiffs had no further scheduled opportunity for compensation that day.

Third, even if the facts of *Olivo* differ because the plaintiffs there did not know whether they actually would be given assignments whereas Plaintiffs here were waiting for compensable work, that distinction does not render the underlying rationale of *Olivo* inapplicable. The *Olivo* court explained that the plaintiff-mechanics' wait time constituted work because the mechanics could not use the time effectively as their own. *See Olivo*, 799 F. Supp. 2d at 1242. Similarly the

evidence here, when construed in Plaintiffs' favor, indicates that the wait time could not be used as Plaintiffs' own and therefore could be characterized as uncompensated "work."

More specifically, the Court concludes that Plaintiffs did not receive compensation for the time spent waiting because the undisputed facts demonstrate that Plaintiffs were paid based only upon each completed delivery and pick-up, and Plaintiff's evidence indicates that the time spent waiting at customer sites occurred *in between* scheduled delivery routes.   Thus, the facts construed in Plaintiffs' favor indicate that Plaintiffs were not compensated for the time spent waiting in between each paid route.

Furthermore, the Court concludes that although Plaintiffs were not paid for their time spent waiting, that time nonetheless constituted "work" for the benefit of DMC because DMC placed significant restrictions on Plaintiffs' during this uncompensated time.   For example, DMC required Plaintiffs to conduct their waiting on their customers' premises, required Plaintiffs to get DMC's authorization to leave the customer sites to use the restroom, and limited the locations at which Plaintiffs could use a restroom.   *See supra* p. 4-5.   By placing these restrictions on Plaintiffs, DMC effectively ensured that the time was not Plaintiffs' own.[4]   Thus, even if Plaintiffs here were waiting to undertake a route for which they would be compensated, while the *Olivo* plaintiffs were left to wait for work that might never come, the reasoning set forth in *Olivo* is equally applicable.   The Court, applying that reasoning, concludes that a factual question exists with respect to whether the wait time in fact constituted work for the benefit of DMC sufficient to alter the piecework compensation structure.   *Cf. id.*

---

[4]   DMC contends that the payment Plaintiffs received compensated them for all of the services they provided to DMC.   *See* Griego Declr., ¶ 21.   The facts construed in Plaintiffs' favor, however, do not suggest that the wait time *in between* scheduled runs was part of the compensation Plaintiffs received for each discrete run.

On the facts construed in Plaintiffs' favor, the Court cannot conclude that the exemption for piecework employees "unmistakably" applies to Plaintiffs. *Cf. State ex rel. State Labor Comm'r v. Goodwill Indus.*, 478 P.2d 543, 545 (N.M. 1970). Plaintiffs have pointed to facts sufficient to create a genuine dispute of material fact with respect to whether Defendant DMC altered the piecework compensation structure when it required Plaintiffs to wait at customer sites in between compensable runs, thereby removing Plaintiffs from the Wage Act's piecework exemption. Because a factual question exists, the Court denies Defendant DMC's Motion for Summary Judgment.

Plaintiffs also argue that Defendants altered the existing piecework scheme by requiring Plaintiffs to undertake various affirmative duties, such as reporting to work and arriving at delivery sites at defined times, scanning merchandise in front of customers, abiding by company policies in making deliveries and pick-ups (including carrying a certain amount and type of insurance, maintaining a cell phone for communication with DMC, and not allowing persons or animals in the vehicle while making deliveries), and conducting extra-contractual pre-and post-delivery duties at the DMC warehouse. *See* Resp. to Mot. for Summ. J. at 1-2. The Court need not consider this additional argument regarding active duties because the Court already has concluded that a material factual question precluding summary judgment exists with respect to whether the passive duty of waiting altered the compensation structure and removed Plaintiffs from the Wage Act's piecework exemption. For purposes of narrowing the issues in this case, however, the Court reaches the question of active duties and decides that the argument lacks merit.

Defendants contend, and the Court agrees, that the affirmative duties Plaintiffs identify are integral to the delivery and pick-up process itself and that Plaintiffs were compensated for completing these duties through the piecework compensation structure. *See, e.g.*, *In re Thompson*

*Bros., Inc. et al.*, No. 92-32, 1993 WL 832137, at *2 (B.S.C.A. Jan. 29, 1993) (assuming without deciding that operators charged with delivering mail were paid on a piece rate (per-mile driven) basis despite the fact that operators spent approximately 30 minutes loading the mail).  Indeed, with the exception of the pre- and post-delivery duties, the affirmative tasks Plaintiffs identify are specifically designated as part of Plaintiffs' duties in their independent contractor agreements, *see supra* p. 2, and the fact that Plaintiffs contracted to conduct these duties supports the Court's conclusion that the duties are part and parcel of Plaintiff's piecework compensation.  Thus, the Court concludes that the active duties Plaintiffs describe do not alter the piecework payment system or otherwise convert Plaintiffs into hourly employees.

## CONCLUSION

For the foregoing reasons, IT THEREFORE IS ORDERED that Defendants' Motion for Summary Judgment [Doc. 43] is DENIED.

Dated this 27th day of March, 2013.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE