# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

ANDREW CASIAS and ERNEST CASIAS,
on behalf of themselves and similarly-
situated employees of Distribution
Management Corporation, Inc.,

        Plaintiffs,

v.                                          Civ. No. 11-00874 MV/RHS

DISTRIBUTION MANAGEMENT
CORPORATION, INC.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion to Strike Affidavits Filed in Support of Plaintiffs' Reply Brief ("Motion to Strike") [Doc. 111], Defendant's Motion for Leave to File a Rebuttal to Plaintiffs' Supplemental Reply ("Motion to File Rebuttal") [Doc. 120], and Plaintiffs' Motion for Class Certification and Memorandum in Support Thereof ("Motion to Certify") [Doc. 86].  The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that the motions are not well taken and will be denied.

## BACKGROUND

Defendant DMC ("Defendant" or "DMC") is a motor carrier with its principal business located in Bernalillo County, New Mexico.  Defendant provides logistics services for its customers throughout the Southwest United States, and as part of these services, DMC coordinates same- and next-day package pick-up and delivery.  [Doc. 44, ¶¶ 3, 4].  Defendant contracts with drivers, including Plaintiffs Ernest Casias and Andrew Casias ("Plaintiffs"), to provide its delivery services.  [*Id.*, ¶ 5].

1

This case arises out of a dispute between the parties regarding whether Defendant misclassified Plaintiffs and other drivers as independent contractors instead of employees. Plaintiffs allege that they are "employees" within the meaning of the New Mexico Minimum Wage Act ("Wage Act" or "Act"), N.M. Stat. Ann. § 50-4-19 *et seq.*, and that Defendant therefore was required to pay them overtime for work in excess of 40 hours per week. *See* N.M. Stat. Ann. § 50-4-22(D). Defendant maintains that Plaintiffs are not employees, but rather are independent contractors, and also that Plaintiffs are exempt from the Wage Act because they are compensated by piecework. *See id.* § 50-4-21(C)(5) (providing that the term "employee" includes an individual employed by an employer, "but shall not include salespersons or employees compensated upon piecework, flat rate schedules or commission basis"). Plaintiffs filed suit in the Second Judicial District, State of New Mexico, County of Bernalillo and Defendant removed the case to this Court pursuant to 28 U.S.C. Section 1332(d)(2).

Plaintiffs filed a Motion to Certify seeking conditional certification of two classes of employees: (1) a class of "all individual drivers with addresses or residences in New Mexico . . . who were classified as independent contractors by Defendant at any time from August 30, 2008, to the present," and (2) a class of "all individual drivers with addresses or residences in states other than New Mexico . . . who were classified as independent contractors by Defendant at any time from August 30, 2008, to the present." [Doc. 86 at 35]. Although Plaintiffs contend that the Wage Act, as interpreted by New Mexico courts, governs the certification procedure, they argue that certification is proper both under the New Mexico certification process and under the class action procedure set forth in Federal Rule of Civil Procedure 23.

Plaintiffs filed a reply in support of their Motion to Certify and attached two affidavits—the affidavit of Mark Andrew L'Esperance and the affidavit of Linnie McClellan—to

2

the reply.   Defendant moves to strike these affidavits on the ground that they raise matters beyond the scope of Defendant's response brief.

On January 13, 2014, the Court ordered Plaintiffs to file a supplemental reply to Defendant's response to the Motion to Certify that specifically addresses Defendant's argument in Section III.F.3 of its response.   Plaintiffs complied with that request, but also offered argument beyond the scope of the Court's January 13, 2014, Order.   [Doc. 119].   Defendant thereafter filed a Motion to File a Rebuttal to the Plaintiffs' supplemental reply.   [Doc. 120].

## STANDARD

I.   Scope of Reply Brief.

A court should not consider new issues raised for the first time in a reply brief.   *See Plottner v. AT&T Corp.*, 224 F.3d 1161, 1175 (10th Cir. 2000) (citing *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 724 (10th Cir.1993)); *W. Coast Life Ins. Co. v. Hoar*, 558 F.3d 1151, 1156 (10th Cir. 2009).   If a district court accepts a reply brief in support of a motion for summary judgment containing new arguments or new materials, the district court has two permissible courses of action:   "It [can] either . . . permit[] a surreply or, in granting summary judgment for the movant, it [can] refrain[] from relying on any new material contained in the reply brief."   *Beaird v. Seagate Tech. Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998), *cert. denied*, 525 U.S. 1054 (1998).

II.   Sur-Replies.

The Local Rules of Civil Procedure for the District of New Mexico provide that leave of court is required to file a sur-reply.   *See* D.N.M.LR-Civ. 7.4(b).   Courts generally do not grant a party leave to file a sur-reply unless the opposing party's reply brief includes new information that the responding party needs an opportunity to address.   *See C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1329 n.1 (D. Kan. 2008) ("[a] surreply will not be allowed unless the reply of the party

3

filing the initial motion contained new information which the responding party needs an opportunity to address") (citation omitted); *see also Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, No. CIV 11-0103 JB/WPL, 2012 WL 1132527, at *15 (D.N.M. Mar. 22, 2012) (sur-reply allowed when a party raises new arguments in a reply, because of the "inequity of a court considering arguments . . . raised for the first time in a reply") (internal quotation marks and citation omitted).

III.   <u>Validity of a Federal Rule of Civil Procedure Before a Federal Court Sitting in Diversity Jurisdiction</u>.

"Under the *Erie* doctrine," it is long settled that "federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).   A federal court sitting in diversity jurisdiction, however, does not automatically "wade into *Erie*'s murky waters" to determine whether a Federal Rule of Civil Procedure constitutes federal procedural law.   *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010).   Rather, a federal court must first determine whether a controlling Federal Rule directly conflicts with state law; if so, the Federal Rule, so long as it is consonant with the Rules Enabling Act, applies in diversity suits.   *See id.* (citations omitted); *see also Hanna v. Plumer*, 380 U.S. 460, 469-74 (1965).

The Rules Enabling Act authorizes the Supreme Court to "prescribe general rules of practice and procedure" for the federal courts, but with a crucial restriction:   "Such rules shall not abridge, enlarge or modify any substantive right."   28 U.S.C. § 2072.   In addressing the question whether a Federal Rule is authorized by the Rules Enabling Act, the Supreme Court has "long held that th[e] limitation [by Congress that a rule shall not abridge, enlarge or modify any substantive right] means that the Rule must 'really regulate procedure—the judicial process for enforcing

rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them.'" *Shady Grove*, 559 U.S. at 407 (quoting *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941)) (additional citations omitted). Thus, the relevant question is "not whether the rule affects a litigant's substantive rights; most procedural rules do. . . . What matters is what the rule itself regulates: If it governs only 'the manner and means by which the litigants' rights are 'enforced,' it is valid; if it alters 'the rules of decision by which the court will adjudicate those rights,' it is not." *Id.* (quoting *Miss. Publishing Corp. v. Murphree*, 326 U.S. 438, 445, 446 (1946)).

IV.     Class Action Procedure Under Federal Rule of Civil Procedure 23.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quotation omitted). Federal Rule of Civil Procedure 23 sets forth the standards for certifying a class action and requires that all four prerequisites of Rule 23(a) and at least one of the three prerequisites of Rule 23(b) are satisfied. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997); *In re Integra Realty Resources, Inc.*, 354 F.3d 1246, 1262 (10th Cir. 2004). Specifically, Rule 23(a) provides, "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Rule 23(b) provides,

A class action may be maintained if Rule 23(a) is satisfied and if:

(1)     prosecuting separate actions by or against individual class

members would create a risk of:

(A)   inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B)   adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2)   the party opposing the class has acted or refused to act on the grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3)   the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. . . .

Fed. R. Civ. P. 23(b).

A federal district court has broad discretion in determining whether to certify a class under Rule 23.   *See Rector v. City & County of Denver*, 348 F.3d 935, 949 (10th Cir. 2003).   To grant class certification, the court must conduct a rigorous analysis that may overlap with the merits of the movant's underlying claims.   *See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (citing *Dukes*, 131 S. Ct. at 2551).   The party moving for class certification must clearly satisfy the requirements of Rule 23.   *See Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).   Merely alleging that the prerequisites are met is insufficient to satisfy this burden.   *See Dukes*, 131 S. Ct. at 2551.   The moving party must "affirmatively demonstrate" that the prerequisites for Rule 23 exist "in fact."   *Id.*   The court should accept the allegations in the

complaint as true, although it "need not blindly rely on conclusory allegations which parrot Rule 23 requirements [and] may . . . consider the legal and factual issues presented by plaintiff's complaints." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999).

V.      Collective Action Procedure Under the New Mexico Minimum Wage Act.

The New Mexico Minimum Wage Act permits a collective action by employees on behalf of "themselves and other employees similarly situated."   N.M. Stat. Ann. § 50-4-26(B)(2). Although the Act does not define the term "similarly situated," the New Mexico Court of Appeals has held that the two-step *ad hoc* approach applied by the Tenth Circuit in *Thiessen v. General Electric Capital Corporation*, 267 F.3d 1095 (10th Cir. 2001), *cert. denied*, 536 U.S. 934 (2002), to determine whether putative class members are similarly situated under the Fair Labor Standards Act ("FLSA") also applies to the question whether prospective plaintiffs are "similarly situated" under Section 50-4-26(B)(2) of the New Mexico Minimum Wage Act.   *See Armijo v. Wal-Mart Stores, Inc.*, 168 P.3d 129, 145 (N.M. Ct. App.) ("we conclude that the two-tiered/ad hoc approach is the proper standard to apply to collective actions under Section 50-4-26(B)(2) of the Minimum Wage Act"), *cert. denied*, 169 P.3d 408 (2007).

Under the "two-tiered" or "*ad hoc*" approach, "'a court typically makes an initial notice stage determination of whether plaintiffs are similarly situated.'"   *Id.* at 144 (citing *Thiessen*, 267 F.3d at 1102).   "At this initial stage, all that is required are 'substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'"   *Id.* (quoting *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997)) (citing *Thiessen*, 267 F.3d at 1102).   "At the second stage, which typically follows discovery and/or a motion to decertify the class, the court must revisit its initial determination, only now under a stricter standard of 'similarly situated.'"   *Id.* (citing *Thiessen*, 267 F.3d at 1102-03).   "Under this stricter

analysis, the court should consider several factors in determining whether the putative class members are similarly situated, including the following:  (1) whether the class members have disparate factual and employment settings, (2) whether the available defenses to the claims are individual to each class member, and  (3) whether there are any fairness or procedural considerations relevant to the action."  *Id.* (citing *Thiessen*, 267 F.3d at 1103.  After considering the above factors, the court must then decide whether the suit may continue as a collective action. *See id.*

## DISCUSSION

I.   <u>Motion to Strike</u>.

Defendant asks the Court to strike the affidavits of Mark L'Esperance and Linnie McClellan, which Plaintiffs attach to their reply in support of their Motion to Certify.  In the Tenth Circuit, a court should not consider issues raised for the first time in a reply brief.  *See Plottner v. A&T& Corp.*, 224 F.3d 1161, 1175 (10th Cir. 2000) (citing *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 724 (10th Cir.1993)); *W. Coast Life Ins. Co. v. Hoar*, 558 F.3d 1151, (10th Cir. 2009).  Plaintiffs argue that they properly attached the affidavits, however, because the affidavits contain facts that rebut the evidence Defendant sets forth in its response.  Defendant contends that the affidavits are not responsive, because the evidence in the response brief was limited to *Ernest Casias'* ability to hire backup drivers, whereas Plaintiffs' evidence depicts *L'Esperance's* and *McClellan's* experiences with backup drivers.

Defendant cites *Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159 (10th Cir. 1998), and *Doebele v. Sprint Corp.*, 168 F. Supp. 2d 1247 (D. Kan. 2001), *aff'd in part and rev'd in part*, 342 F.3d 1117 (10th Cir. 2003), in support of its argument that the Court should strike the affidavits. In *Beaird*, the Tenth Circuit explained that if a district court accepts a reply brief in support of a

motion for summary judgment containing new arguments or new materials, the district court has two permissible courses of action:   "It could either . . . permit[] a surreply or, in granting summary judgment for the movant, it could . . . refrain[] from relying on any new material contained in the reply brief."   145 F.3d at 1164.   In *Doebele*, the district court held that if a reply brief, or an attached affidavit supporting the brief, "'merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers—both briefs and affidavits—may properly address those issues.'"   168 F. Supp. 2d at 1254 (quoting *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996)) (additional citation omitted).   In so holding, the district court distinguished the Tenth Circuit's decision in *Beaird* on the ground that it applied only to new legal arguments supported by new materials and not to new material supported by legal arguments already made.   *See Doebele v. Sprint/United Mgmt. Corp.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003).   The Tenth Circuit in *Doebele*, however, overruled the district court's decision, holding instead that "*Beaird* speaks in terms of either new legal arguments *or* new material."   *Id.* (emphasis added).

Under the Tenth Circuit's standard, the Court concludes that the evidence contained in the L'Esperance and McClellan affidavits constitutes new evidence that is not responsive to the evidence contained in Defendant's opposition brief.   The Court, however, denies the Motion to Strike the affidavits, because Defendant fails to present any argument in its Motion to Strike challenging the admissibility of the affidavit evidence and fails to provide any explanation as to why consideration of the evidence might prejudice Defendant.   Ironically, Defendant maintains—and this Court holds—that the evidence supports the Defendant's claim that the evidence in this case is individualized.

Because the Court is denying the Motion to Certify, any ruling on Defendant's Motion to

Strike is of little practical value.   Although the Court perceives no reason for additional briefing, the Court nonetheless grants Defendant the right to file a sur-reply to comply with the Tenth Circuit's instruction in *Beaird*.   *See* 145 F.3d at 1164 (a court presented with new evidence in a reply may either give the opposing party an opportunity to reply or refuse to consider the evidence).   The Court therefore grants Defendant the opportunity to file, within five days from the date of this memorandum opinion and order, a sur-reply (not to exceed five pages) that responds to the factual assertions contained in the L'Esperance and McClellen affidavits.   In the unlikely event the sur-reply, if filed, alters the Court's decision herein, it will issue an amended memorandum opinion and order.

II.   <u>Motion to File Rebuttal</u>.

Defendant asks the Court to allow it to file a rebuttal to Plaintiffs' Supplemental Reply on Certifying New Mexico Wage Act Collective Action ("Supplemental Reply").   Plaintiffs filed this Supplemental Reply pursuant to the Court's January 13, 2014, Order, in which the Court instructed Plaintiffs to reply to DMC's argument—set forth in Section III.F.3 of its response to the Motion to Certify—that Federal Rule of Civil Procedure 23 controls the procedural steps of this representative action.   [Doc. 113].   Defendant contends that a rebuttal is necessary because the question whether Rule 23 or the New Mexico *ad hoc* approach to certifying a representative action applies is at "the very heart of the dispute between the parties."   [Doc. 120 at 2].   Defendant further contends that Plaintiffs' Supplemental Reply identifies new authority beyond the scope of the Court's January 13, 2014, Order.   [*Id.*].

The Court is not persuaded by Defendant's argument that Plaintiffs' Supplemental Reply, at least to the extent it complies with the scope of the Court's January 13, 2014, Order, merits a rebuttal.   That the issue in the Supplemental Reply goes to the "heart" of the matter in dispute is

not a ground for filing a sur-reply.   Courts generally do not grant a party leave to file a sur-reply unless the opposing party's reply brief includes new information that the responding party needs an opportunity to address.   *See C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1329 n.1 (D. Kan. 2008) (citation omitted); *see also Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, No. CIV 11-0103 JB/WPL, 2012 WL 1132527, at *15 (D.N.M. Mar. 22, 2012).   Plaintiffs' Supplemental Reply—to the extent it complies with the Court's January 13, 2014, Order—does not include new information but rather only responds to the argument regarding the applicability of Rule 23 raised by Defendant in Section III.F.3 of its response brief.   Thus, Defendant is not entitled to file any additional briefing on the question whether Rule 23 applies.

Defendant's Motion to File a Rebuttal also seeks to respond to Plaintiffs' Supplemental Reply to the extent the reply exceeds the scope of the Court's January 13, 2014, Order.   The Court, however, declines to consider this request.   Rather, the Court *sua sponte* moves to strike the portions of Plaintiffs' Supplemental Reply that exceed the scope of the Court's order. Because the Court strikes the non-responsive portions of the Supplemental Reply, Defendant's Motion to File a Rebuttal to those portions of the Supplemental Reply is moot and therefore denied.

III.   <u>Motion to Certify</u>.

Plaintiffs argue that conditional certification is proper both under the New Mexico Wage Act's more lenient collective action certification procedure, N.M. Stat. Ann. § 50-4-26, and under Federal Rule of Civil Procedure 23's more stringent certification standard.   Defendant contends that Rule 23's more stringent standard applies and precludes certification.   Alternatively, Defendant maintains that even if the Wage Act's more lenient standard applies, that standard also mandates denial of the motion.

11

A.     Federal Rule of Civil Procedure 23 Governs the Procedure for Class Certification.

The Court first addresses whether the New Mexico Wage Act's relaxed *ad hoc* approach to certification applies or whether the class certification procedure set forth in Federal Rule of Civil Procedure 23 governs Plaintiff's request for class treatment.   "Under the *Erie* doctrine," "federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  In *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010), however, the Supreme Court explained that a federal court sitting in diversity jurisdiction does not automatically "wade into *Erie*'s murky waters" to determine whether a Federal Rule of Civil Procedure constitutes federal procedural law.  *Id.* at 398.  Rather, a federal court must first determine whether a controlling federal rule directly conflicts with state law, and if so, determine whether the federal rule is consonant with the Rules Enabling Act; if the Rule is authorized by the Act, the federal rule applies and an *Erie* analysis is unnecessary.  *See id.*; *see also Hanna v. Plumer*, 380 U.S. 460, 469-74 (1965).

The Rules Enabling Act authorizes the Supreme Court to "prescribe general rules of practice and procedure" for the federal courts provided that the rules do "not abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072.  The Supreme Court has held a federal rule does not "abridge, enlarge or modify any substantive right" if the rule "'really regulate[s] procedure—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them.'"  *Shady Grove*, 559 U.S. at 407 (quoting *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941)) (additional citations omitted)).

The Supreme Court already has held that Federal Rule of Civil Procedure 23 does not

abridge, enlarge, or modify any substantive right and that it therefore is authorized by the Rules

Enabling Act.   In *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S.

393 (2010), the Supreme Court concluded that Federal Rule of Civil Procedure 23 governed

whether a plaintiff medical provider's suit could proceed as a class action and not a conflicting

New York law prohibiting class actions in suits seeking penalties or statutory minimum damages.

*See id.* at 406-08.   In *Shady Grove*, the plaintiff medical provider treated a patient for injuries

sustained in an automobile accident, and the patient assigned the medical provider her rights to

insurance benefits under an automobile policy issued by the defendant insurer.   *See id.* at 397.

Although the insurer paid the claim to the medical provider, it did not do so in a timely manner and

it refused to pay the statutory interest that had accrued on the overdue benefits.   *See id.*   The

medical provider filed suit in the Eastern District of New York to recover the unpaid statutory

interest on behalf of itself and a class of all others to whom the insurer owed statutory interest.

*See id.*   The district court dismissed the suit for lack of jurisdiction, reasoning that New York

Civil Practice Law Annotated Section 901(b)—which precludes class treatment in a suit to recover

a penalty or statutory minimum damages (*e.g.*, the statutory interest the medical provider sought

from the insurer)—applies in diversity suits in federal court and not Federal Rule of Civil

Procedure 23.   *Id.*   The United States Court of Appeals for the Second Circuit affirmed.   *See id.*

at 398.   The Second Circuit did not dispute that a federal rule adopted in compliance with the

Rules Enabling Act would control if it conflicted with Section 901(b), but rather held that there

was no conflict between Rule 23 and Section 901(b).   *See id.*   The Second Circuit further

determined that Section 901(b) was a substantive provision within the meaning of *Erie R.R. Co. v.*

*Tompkins*, 304 U.S. 64 (1938), and thus that Section 901(b) must be applied by a federal court

sitting in diversity.   *See id.*

The Supreme Court reversed. In addressing the first relevant question—whether a controlling federal rule directly conflicts with state law, the Court disagreed with the Second Circuit and held that a conflict exists. *See id.* at 399. The Supreme Court explained, the

> question in dispute is whether [the medical provider's] suit may proceed as a class action. Rule 23 provides an answer. It states that '[a] class action may be maintained] if two conditions are met: The suit must satisfy the criteria set forth in subdivision (a) (*i.e.*, numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b).

*Id.* at 398 (citing Fed. R. Civ. P. 23(b)). The Court held that Section 901(b) also attempts to answer the question in dispute—whether the medical provider's suit may proceed as a class action—because Section 901(b) provides that "'an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action.'" *Id.* at 396; *see id.* at 399. The Court rejected the Second Circuit's reasoning that there was no conflict between Rule 23 and Section 901(b). *See id.* The Second Circuit reasoned that "Rule 23 . . . concerns the criteria for determining whether a given class can and should be certified [whereas] Section 901(b) addresses [the] antecedent question[] whether the particular type of claim is eligible for class treatment in the first place—a question on which Rule 23 is silent." *Id.* (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 549 F.3d 137, 143-44 (2d Cir. 2008)). The Supreme Court held that the "line between eligibility and certifiability is entirely artificial," and that the broad language of Rule 23 does not indicate that it applies only if some other law makes a plaintiff's claims eligible for class treatment. *Id.* at 399-400. Rather, the Court concluded that, "like the rest of the Federal Rules of Civil Procedure, Rule 23 *automatically* applies in all civil actions and proceedings in the United States district courts." *Id.* at 400 (internal quotation marks and citations omitted).

14

Because the Supreme Court held that Rule 23 and Section 901(b) conflict—*i.e.*, both rules attempt to answer the same question in dispute—the Court explained that it must next address the second relevant question, which required it to "confront head-on whether Rule 23 falls within the statutory authorization" of the Rules Enabling Act. *Id.* at 406. The Court further explained that if Rule 23 is authorized by the Rules Enabling Act, the rule is valid and the Court need not "wade into *Erie*'s murky waters." *Id.* at 398.[1] As discussed, a federal rule is authorized by the Rules Enabling Act if it does "'not abridge, enlarge or modify any substantive right,'" *id.* at 406-07 (quoting 28 U.S.C. § 2072(b)), which means that the rule "'really regulate[s] procedure.'" *Id.* at 407 (quoting *Sibbach*, 312 U.S. at 14) (additional citations omitted)). The *Shady Grove* Court explained that the relevant question is "not whether the rule affects a litigant's substantive rights; most procedural rules do. . . . What matters is what the rule itself regulates: If it governs only 'the manner and means by which the litigants' rights are 'enforced,' it is valid; if it alters 'the rules of decision by which the court will adjudicate those rights,' it is not." *Id.* at 407 (quoting *Miss. Publishing Corp. v. Murphree*, 326 U.S. 438, 445, 446 (1946)). The Supreme Court noted, that in applying this test, the Court has "rejected every statutory challenge to a Federal Rule that has come before [the Court]," because although "[e]ach of the[] rules [challenged] had some practical effect on the parties' rights, . . . each undeniably regulated only the process for enforcing those rights;

---

[1] The Court explained why a federal rule's validity does not automatically implicate the *Erie* doctrine. The Court indicated that *Erie* involved the constitutional power of federal courts to supplant state law with judge-made rules, and thus in *Erie*, the substance/procedure distinction was not relevant, because the touchstone was whether applying federal law "'significantly affect[s] the result of a litigation.'" *Id.* at 406 (quoting *Guar. Trust Co. v. York*, 326 U.S. 99, 109 (1945)). The Court held that *Erie* does not supply the test for the constitutionality or the statutory validity of a Federal Rule of Procedure, for *Congress*—in contrast to judges—has "undoubted power to supplant state law, and undoubted power to prescribe rules for the courts it has created, so long as those rules regulate matters 'rationally capable of classification' as procedure." *Id.* at 406 (citation omitted).

none altered the rights themselves, the available remedies, or the rules of decision by which the court adjudicated either."  *Id.*

Consistent with its long history of finding every federal rule challenged valid under the Rules Enabling Act, the Court held that Federal Rule of Civil Procedure 23 was statutorily authorized under the Rules Enabling Act.  *See id.* at 408 ("Applying that criterion, we think it obvious that rules allowing multiple claims . . . to be litigated tougher are also valid" and holding that "Rule 23 . . . falls within § 2072(b)'s authorization") (citations omitted).  In reaching this conclusion, the Court explained that Rule 23, and other rules allowing multiple claims to be litigated together (*i.e.*, Rule 18 governing joinder of claims, Rule 20 governing joinder of parties, and Rule 42(a) governing consolidation of actions), "neither change plaintiffs' separate entitlements to relief nor abridge defendants' rights; they alter only how the claims are processed." *Id.*  "Rule 23 . . . merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits.  And like traditional joinder, it leaves the parties' legal rights and duties intact and the rule of decision unchanged."  *Id.*

The Supreme Court rejected the defendant insurer's argument that the Court must look not to whether the Federal Rule itself is truly procedural, but rather to whether the state law creates a substantive right that is abridged by the Federal Rule.  *See id.* at 409.  The Court rejected this proposition and explained that under the defendant's reasoning a federal rule might be valid in some jurisdictions but invalid in others, depending upon whether the state law with which it conflicted created a substantive right.  *See id.* ("A Federal Rule of Procedure is not valid in some jurisdictions and invalid in others—or valid in some cases and invalid in others—depending upon whether its effect is to frustrate a state substantive law.").  The Supreme Court explained that in *Sibbach v. Wilson & Co.*, it had rejected the idea that a court must look to the "'importance of the

16

alleged [state] right,'" and confirmed that the "'test must be whether a [federal] rule really regulates procedure.'"   *Id.* at 409-10 (quoting *Sibbach*, 312 U.S. at 13-14).   Moreover, the Supreme Court noted that in *Hanna v. Plumer*, it also "unmistakably expressed the same understanding that compliance of a Federal Rule with the Enabling Act is to be assessed by consulting the [Federal] Rule itself, and not is effects in individual applications."   *Id.* at 410 (citing *Hanna v. Plumer*, 380 U.S. 460, 471 (1965)).   Thus, the *Shady Grove* Court concluded, "In sum, it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule.   We have held since *Sibbach*, and reaffirmed repeatedly, that the validity of a Federal Rule depends entirely upon whether it regulates procedure."   *Id.* (citations omitted).   The Court further concluded that "[i]f [a rule regulates procedure], it is authorized by [the Rules Enabling Act] and is valid *in all jurisdictions*, with respect to *all claims*, regardless of its incidental effect upon state-created rights."   *Id.* (emphasis added).

The Supreme Court's holding in *Shady Grove* is controlling here and requires this Court to hold that Federal Rule of Civil Procedure 23—and not the collective action provision contained in Section 50-4-26(B)(2) of the New Mexico Wage Act—sets forth the standard for determining whether Plaintiffs' action may proceed as a class action.   Here, as in *Shady Grove*, Rule 23 and Section 50-4-26(B)(2) both attempt to answer the same question.   Rule 23 permits all class actions that meet its requirements.   Section 50-4-26(B)(2) of the New Mexico Wage Act permits a collective action by employees on behalf of "themselves and other employees similarly situated." N.M. Stat. Ann. § 50-4-26(B)(2).   Although the Wage Act does not define the term "similarly situated," the New Mexico Court of Appeals has held that a two-step *ad hoc* approach applies to determining whether employees are "similarly situated" within the meaning of Section

50-4-26(B)(2).   *See Armijo v. Wal-Mart Stores, Inc.*, 168 P.3d 129, 145 (N.M. Ct. App.), *cert. denied*, 169 P.3d 408 (2007).   Rule 23 and Section 50-4-26(B)(2), as interpreted by the New Mexico Court of Appeals, both answer the question whether a class action can proceed.

The *Shady Grove* Court instructed that when a state and federal rule conflict, a court must next analyze whether the federal rule is statutorily authorized under the Rules Enabling Act.   *See id.* at 401, 408.   The Supreme Court already has conducted the analysis whether Rule 23 is statutorily authorized and has held that Rule 23 is valid under the Rules Enabling Act because it is procedural.   *See id*.   The *Shady Grove* Court specifically rejected the notion that a federal rule could be valid in one jurisdiction and invalid in another, *see id.* at 409, and instead held that Rule 23 "is valid *in all jurisdictions*, with respect to *all claims*, regardless of its incidental effect upon state-created rights," *id.* at 410 (emphasis added).   Because the Supreme Court has held that Rule 23 is statutorily authorized and valid in all jurisdictions, this holding controls here regardless of any incidental effect that the application of Rule 23 would have on the state-created right to proceed as a collective action under the New Mexico Wage Act's more lenient *ad hoc* approach to certification.   *Cf. id.*   Thus, the Court holds that Federal Rule of Civil Procedure 23 sets the standard for determining whether Plaintiffs' action can proceed as a class action.

B.     Certification is Improper Under Federal Rule of Civil Procedure 23.

The Court next determines whether certification of Plaintiffs' proposed classes is proper under Federal Rule of Civil Procedure 23.   Plaintiffs, as the parties moving for class certification, must   affirmatively   demonstrate   that   they   have   satisfied   the   requirements   of   Rule 23.   *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).   To carry their burden, Plaintiffs must satisfy all four prerequisites of Rule 23(a) and must demonstrate that they fall within at least one of the three categories identified

in Rule 23(b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997); *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1262 (10th Cir. 2004).  The Court first considers whether Plaintiffs have satisfied Rule 23(b)(3), and next determines whether Plaintiffs have satisfied Rules 23(b)(1) or 23(b)(2).  Because the Court holds that Plaintiffs have not demonstrated that they have satisfied the requirements of any one of the three categories of class actions set forth in Rule 23(b), and this holding necessarily compels the denial of Plaintiffs' Motion to Certify, the Court declines to consider whether Plaintiffs have satisfied the requirements of Rule 23(a).

      1.      Rule 23(b)(3).

Federal Rule of Civil Procedure 23(b)(3) requires that "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).[2]  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods.*, 521 U.S. at 623.  To determine whether the class is sufficiently cohesive, a court must identify the underlying elements of the substantive claim.  *See  Freeland v. AT&T Corp.*, 238 F.R.D. 130, 142 (S.D.N.Y. 2006) (in conducting a predominance inquiry, "a court considers whether the putative class members 'could establish each of the required elements of their claims using common evidence'") (quoting *VisaCheck/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001)); *In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 273 F.R.D. 499, 513 (N.D. Ind. 2010) (explaining that "[t]o decide whether the liability issues are subject to class-wide proof, the court should consider the elements of plaintiffs' claims"); *see also Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 316 (5th Cir. 1978).  Once the elements are established, a

---

    [2]  Rule 23(b)(3) also requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

court must evaluate whether the putative class members could establish the elements using common evidence, so that common issues predominate. *See, e.g.*, *Visa Check*, 280 F.3d at 136 ("[T]o meet the predominance requirement, a plaintiff must establish that 'the issues that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'") (quoting *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000)); *FedEx*, 273 F.R.D. at 513 (once a court has identified the elements, the court should consider the proof necessary to establish those elements).

a.     The Elements of the Claims.

Plaintiffs allege that Defendant has misclassified its truck drivers as "independent contractors" in five states and that these drivers are actually employees entitled to overtime wages pursuant to Section 50-4-22(D) of the New Mexico Wage Act.[3]  [Doc. 1-2, ¶¶ 10, 11, 51, 68]. Plaintiffs maintain that the primary issue involved in determining whether Defendant is liable to them for overtime wages is "whether [Plaintiffs] are employees or independent contractors."  [*Id.*, ¶ 61].  The Wage Act does not specifically define "employee," but rather provides a list of workers who do not fall within the Act's definition of "employee."  *Id.* § 50-4-21(C) ("'employee' includes an individual employed by an employer, but shall not include . . .").  The New Mexico Court of Appeals has held that, "[i]n determining whether a person is an employee under the Minimum Wage Act 'the ultimate issue is whether as a matter of economic reality the particular worker is an employee.'"  *Garcia v. Am. Furniture Co.*, 689 P.2d 934, 938 (N.M. Ct. App. 1984) (quoting *Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1189 (5th Cir.

_____

[3]   The New Mexico Wage Act provides in relevant part that "[a]n employee shall not be required to work more than forty hours in any week of seven days, unless the employee is paid one and one-half times the employee's regular hourly rate of pay for all hours worked in excess of forty hours."  N.M. Stat. Ann. §50-4-22(D).

1979)).[4]   Under the economic reality test, "The ultimate issue is a question of fact which requires consideration of the 'total employment situation.'"   *Id.* (quoting *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669 (5th Cir. 1968)).   In conducting this examination, a court examines factors such as pay, contract, control and voluntary action.   *See id.*   "The 'economic realities' test seeks to look past technical, common-law concepts of the master and servant relationship to determine whether, as a matter of economic reality, a worker is dependent on a given employer."   *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 506 (10th Cir. 2012) (citing *Baker v. Flint Engineering & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998)).[5]   "The focal point in deciding whether an individual is an employee is whether the individual is *economically dependent* on the business to which he renders service, or is, as a matter of economic fact, in business for himself."   *Doty v. Elias*, 733 F.2d 720, 722-23 (10th Cir. 1984) (emphasis added) (citations omitted).   "In applying the economic reality test, courts generally look at (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business;

---

[4]   If a federal district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the federal district court] must . . . predict how the Supreme Court of New Mexico would [rule]."   *Guidance Endodontics, LLC v. Dentsply Intern., Inc.*, 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).   In predicting what the state's highest court would do, "[the court] may seek guidance from decisions rendered by lower courts in the relevant state."   *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).   The court should "'follow any intermediate state court decision unless other authority convinces [the court] that the state supreme court would decide otherwise.'"   *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1230 (10th Cir. 2000) (citing *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1574 (10th Cir. 1984)) (additional internal citations omitted in part), *cert. denied*, 531 U.S. 926 (2000); *see also West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that [decision] is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.").

[5]   Although Tenth Circuit law is not controlling on the question whether the Wage Act applies, New Mexico courts have looked to Tenth Circuit law regarding the FLSA for guidance. *See, e.g.*, *Armijo v. Wal-Mart Stores, Inc.*, 168 P.3d 129, 145 (N.M. Ct. App.) (citing *Garcia v. Am. Furniture Co.*, 689 P.2d 934, 937-38 (N.M. Ct. App. 1984)), *cert. denied*, 169 P.3d 408 (2007).

(4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business."  *Baker*, 137 F.3d at 1440.  A court also "inquir[es] into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records."  *Id.*  "None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach."  *Id.*

A second issue in this case is whether, as Defendant maintains, Plaintiffs are exempt from the Wage Act because Defendant pays them pursuant to a piecework compensation structure.  *See* N.M. Stat. Ann. § 50-4-21(C)(5) (providing that the term "employee" includes an individual employed by an employer, "but shall not include salespersons or employees compensated upon piecework, flat rate schedules or commission basis").  This affirmative defense requires the Court to examine the substantive elements of the defense.  In a memorandum opinion and order dated March 27, 2013, this Court denied summary judgment to Defendant on the question whether Plaintiffs were piecework employees.  [Doc. 81].  The Court concluded that Defendant paid Plaintiffs on a piecework basis because Plaintiffs' compensation was fixed according to the routes they serviced, [*id.* at 9], but held that this conclusion did not resolve the Plaintiffs' contention that they were excluded from the definition of "employee" because Plaintiffs presented evidence indicating that Defendant altered the piecework compensation structure when it required Plaintiffs to wait in between scheduled deliveries.  The evidence indicated that the wait time in between scheduled runs was not Plaintiffs' own, but rather was for the benefit of Defendant, because Plaintiffs were required to remain in wait at the customer site of Defendant's choosing, they were not allowed to leave the pick-up or drop-off locations without Defendant's authorization, and they

could not take bathroom breaks without Defendant's approval.   [*Id.* at 13].   The Court held that this evidence of uncompensated wait time for the benefit of Defendant raised a factual dispute whether Defendant altered the piecework compensation structure, thereby removing Plaintiffs from the Wage Act's piecework exemption.   [*Id.* at 16].

b.   <u>Common or Individualized Evidence</u>.

Having set forth the substantive elements of Plaintiffs' underlying claim and Defendant's affirmative defense, the Court next must evaluate whether Plaintiffs and the putative class members could establish the elements using common evidence, so that the common issues predominate.   *See, e.g.*, *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 136 (2d Cir. 2001); *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 142 (S.D.N.Y. 2006) (citation omitted).   Defendant argues that the evidence supporting Plaintiffs' contention of misclassification necessitates individualized inquiries and that Plaintiffs therefore cannot satisfy their burden of demonstrating that common questions predominate.   Specifically, Defendant contends that an allegation of a common policy of misclassifying workers as exempt cannot supply the common thread between class members. [Doc. 104 at 10-12, 14].   Plaintiffs maintain that "[t]he proof [of their claim that they were employees and not independent contractors] will be the same for all Plaintiffs and class members," that it will "consist of evidence . . . describing Defendant's policies and restrictions of Plaintiff drivers," and that these "policies and restrictions were applicable to all drivers."   [Doc. 86 at 29].

In support of Defendant's argument that a uniform policy of misclassification of employees cannot satisfy the predominance inquiry, Defendant points to the United States Court of Appeals for the Ninth Circuit's decisions in *In re Wells Fargo Home Mortgage Overtime Pay Litigation*, 571 F.3d 953, 958 (9th Cir. 2009), and *Vinole v. Countrywide Home Loans, Inc.*, 571

23

F.3d 935 (9th Cir. 2009).   Defendant contends that these cases stand for the proposition that a district court cannot rely on an internal policy to establish that common questions predominate. [*Id.* at 14-15].   Contrary to Defendant's contention, however, the Ninth Circuit's decisions do not stand for this proposition.   Rather, as discussed herein, *Wells Fargo* and *Vinole* hold only that, when the proof relevant to the applicability of a uniform exemption policy is not common, but rather requires individual inquiries, a uniform policy of misclassifying workers does not satisfy the predominance requirement.

The holdings in *Wells Fargo* and *Vinole* frame the relevant inquiry for purposes of determining whether claims premised upon a uniform policy of misclassification can survive the predominance inquiry.   In *Wells Fargo*, the Ninth Circuit rejected the plaintiffs' argument that an employer's uniformly-applied exemption policies create a presumption that class certification is proper and instead held that an exemption policy is one of several factors relevant to the predominance inquiry.   *See* 571 F.3d at 959.   The *Wells Fargo* court conceded that "uniform corporate policies will often bear heavily on questions of predominance" and acknowledged that "courts have long found that comprehensive uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes."   *Id.* at 958 (citation omitted).   The Ninth Circuit explained that "[s]uch centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof."   *Id.* at 958-59.   The Circuit noted, however, that the approach of *presuming* certification is proper when an employer has uniformly-applied exemption policies "disregards the existence of other potential individual issues," "not susceptible to common proof," "that may make class treatment difficult if not impossible."   *Id.* at 959.   Instead of adopting such a presumption, the *Wells Fargo* court examined the nature of the internal company policy and determined whether the

policy would "facilitate common proof on otherwise individualized issues." *Id.* ("[the employer-bank]'s blanket application of exemption status, whether right or wrong, is not [a rule that suggests uniformity among employees susceptible to common proof]," but rather it "does nothing to facilitate common proof on the otherwise individualized issues").

In examining the policy at issue in *Wells Fargo*, the Ninth Circuit explained that some corporate policies likely facilitate common proof while others do not. The *Wells Fargo* court suggested that the uniform exemption at issue—*i.e.*, the federal outside salesperson exemption which applies "where, among other things, the employee is 'customarily and regularly away from the employer's' place of . . . business. . . ,"—"often . . . will militate against certification because . . . it requires a fact-intensive inquiry into each potential plaintiff's employment situation." *Id.* (quoting 29 C.F.R. § 541.500(a). In contrast, the court noted that a "centralized policy requiring employees to be at their desks for 80% of their workday would change this individual issue into a common one [and] would be highly relevant to the predominance analysis." *Id.* The Ninth Circuit rejected the district court's conclusion that the employer defendant's uniform exemption policy satisfied the predominance requirement. *See id.* The district court had acknowledged that numerous individualized inquiries would be necessary, regarding, for instance, each employee's particular job experiences, the amount of time each worked, how each spent his or her time, where each primarily worked, and each employee's level of compensation, but the district court nonetheless found that the defendant's uniform exemption policy satisfied predominance. *See id.* The Ninth Circuit, disagreed, and held that the individual inquiries identified by the district court predominated, despite the common exemption policy, because the court must "still ask where the individual employees *actually* spent their time." *Id.* at 959 (emphasis added). Because the district court failed to afford these individualized inquiries the appropriate weight and relied

almost exclusively on the defendant-employer's internal policy as the basis for class certification, the Ninth Circuit remanded the case back to the district court to conduct a new certification analysis. *See id.* at 959.

In *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935 (9th Cir. 2009), the Ninth Circuit also rejected the argument that the court should adopt a rule that class certification satisfies the predominance test whenever an employer uniformly classifies a group of employees as exempt. *See id.* at 945-46 (citations omitted). In *Vinole*, as in *Wells Fargo*, the employer justified its uniform policy of exemption on the federal and California outside salesperson exemptions. *See id.* at 945. The Ninth Circuit, relying upon its opinion in *Wells Fargo*, held "that a district court abuses its discretion in relying on an internal uniform exemption policy to the near exclusion of other factors;" rather, a court must consider "all factors that militate in favor of, or against, class certification." *Id.* at 946 (citation omitted). The Circuit explained that this approach is consistent with that taken by several district courts that "acknowledge[] the employer's uniform application of an exemption to employees, but focus[] on whether the employer exercised some level of centralized control in the form of standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs, and other factors susceptible to common proof." *Id.* (citations omitted).

After considering all the relevant factors, the Ninth Circuit concluded that the district court did not abuse its discretion in concluding that the uniform exemption policy was not susceptible to common, centralized, or standardized proof. *See id.* at 947. The district court ultimately determined that although there were common issues, including uniform classification, the common issues did not predominate and the inquiry into each employee's exempt status—*i.e.*, how each employee actually spends his or her time—would burden the court. *See id.* The Ninth

26

Circuit held that "this [was] a legitimate concern," and that the "[p]laintiffs' claims will require inquiries into how much time each individual [employee] spent in or out of the office and how the [employee] performed his or her job." *Id.*   Thus, the Ninth Circuit concluded that district court did not abuse its discretion in denying certification.   *See id.* at 947-48.

In both *Vinole* and *Wells Fargo*, the Ninth Circuit cited the Southern District of New York's decision in *Damassia v. Duane Reade, Inc.*, in support of the proposition that a uniform exemption policy can satisfy Rule 23(b)(3)'s predominance requirement when accompanied by other evidence of centralized and standardized control.   In *Damassia*, the assistant manager plaintiffs challenged their employer's uniform practice of classifying them as "exempt" from the overtime requirements based upon the administrative exemption to the FLSA, which covers employees who have as their "primary duty" the "'performance of office . . . work directly related to the management or general business operations of the employer'" requiring the "'exercise of discretion . . . with respect to matters of significance.'"   250 F.R.D. 152, 155 (S.D.N.Y. 2008) (quoting 29 U.S.C. § 213; 29 C.F.R. § 541.200).   The employer argued that "'individual issues predominate'" because "'the duties and responsibilities of [assistant managers] varied . . . in ways that bear upon an analysis of whether or not management was the 'primary duty' of individual [assistant managers].'"   *Id.* at 159 (quoting Defendant's brief).   The *Damassia* court disagreed. The court pointed out that the employer drug store chain presented evidence "'that the business practices at issue in this case are uniform among its stores', and that the duties and responsibilities of assistant managers are 'centrally derived.'"   *Id.* (quoting *Chowdhury v. Duane Reade, Inc.*, No. 06-CIV-2295 (GEL), 2007 WL 2873929 at *4 (S.D.N.Y. 2007)).   The employer "sets forth the duties of all assistant managers in a single job description document . . . , and has a single set of 'protocols' that are 'applied to all Duane Reade stores in New York State.'"   *Id.*   The employer

"also has a single 'Employee Rules Handbook' governing the behavior of store level employees, including assistant managers, in all [of its] stores."   *Id.*   The *Damassia* court concluded that "the responsibilities of assistant managers are derived and controlled by policies and protocols . . . and do not vary materially from store to store. . . .   Because the weight of evidence supports the position that the job responsibilities for assistant managers are largely and materially consistent, there is no merit to the argument that inconsistencies in the position defeat predominance."   *Id.* at 161.

The *Damassia* court reasoned that its holding was in accordance with the decisions of other courts.   The court explained, "Where, as here, there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities."   *Id.* at 160-61 (citations omitted).[6]   The court distinguished cases in which a number of courts denied class certification to employees alleging misclassification, on the ground that the plaintiffs in those cases did not offer "substantial evidence . . . of comprehensive corporate policies that defined the job's duties" and on the ground that the proof of the actual duties of the job would be highly individualized.   *Id.* at 161 n.4 (citing *Myers v. Hertz Corp.*, No. 02 Civ. 4325, 2007 WL 2126264, at *5 (E.D.N.Y. July 24, 2007) ("[P]roof of liability will not turn on what Hertz did or did not do vis-à-vis the entire class, but rather what each member of the class does on a daily basis."); *Diaz v. Electronics Boutique of America, Inc.*, No.

---

[6]   *See also Goldman v. Radioshack Corp.*, No. Civ. A. 03-0032, 2005 WL 1124172, at *4 (E.D. Pa. May 9, 2005) (holding that plaintiff store managers satisfied the predominance requirement where the managers claimed they wrongfully were classified as exempt and denied overtime wages, because the evidence was common to all managers and demonstrated that the employer had many standardized procedures, that the procedures limited managers' discretion, and that the procedures dictated that managers spend the majority of their time on non-exempt activities), *cited in Damassia*, 250 F.R.D. at 160-61.

04-CV-0840E, 2005 WL 2654270, at *7 (W.D.N.Y. Oct. 17, 2005) (determination of class members' job responsibilities requires "a detailed factual analysis of [each class member's] daily activities and responsibilities"); *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1272 (M.D. Ala. 2004) (rejecting plaintiffs' reliance only on "representative proof" and not company-wide policies to establish class members' job duties)) (additional citations omitted).

The Court finds the reasoning set forth in *Wells Fargo*, *Vinole*, and *Damassia* persuasive. The Court agrees with the conclusion that, in deciding whether an employer's uniform exemption policy is supported by common evidence sufficient to satisfy Rule 23(b)(3)'s predominance requirement, one of the relevant inquiries is whether the evidence demonstrates that the "employer exercised some level of centralized control in the form of standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs, and other factors susceptible to common proof," *Vinole*, 571 F.3d at 946, or whether the plaintiffs intend to prove their claims by individual inquiries into the circumstances of each employee, *see id.* at 946-47. To answer this question, the Court must examine the evidence that will support Plaintiffs' Wage Act claims and Defendant's affirmative defense to those claims and determine whether that evidence is predominantly common or individualized.[7]

To prove their claim that Plaintiffs and the putative class members are "employees" under the Wage Act, Plaintiffs must produce evidence to satisfy the economic realities test. Although the factors relevant to this inquiry are manifold, *see Garcia v. Am. Furniture Co.*, 689 P.2d 934, 938 (N.M. Ct. App. 1984); *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1440 (10th Cir.

---

[7] In examining the evidence the parties have produced, the Court emphasizes that it is not making a decision on the merits of this case. The Court is not weighing the evidence or accepting the substance of the evidence submitted by Defendant over the substance of any evidence submitted by Plaintiffs. Rather, the Court simply examines the evidence to determine whether it is common to all putative class members or whether the evidence is individualized.

1998), the parties focus primarily on evidence related to the degree of Defendant's control over the putative class members' work, *cf. Garcia*, 689 P.2d at 938; *Baker*, 137 F.3d at 1440, including whether Defendant had the power to supervise or control work schedules or conditions of employment, *id*.   The parties also present evidence regarding wait time in between scheduled deliveries, which is relevant both to the questions of control and whether Defendant altered its piecework compensation structure.   [Doc. 81 at 16].

In support of their argument that the putative class members were employees misclassified by Defendant as independent contractors, Plaintiffs identify seven contracts entered into after 1999 that Defendants produced in response to a request for production that sought *all* contracts that DMC has "ever entered into with . . . 'independent contractors' who have served as drivers." [Doc. 86 at 3-4; Doc. 88].   These contracts demonstrate that Defendant classified the drivers who signed them as "independent contractors."   [*Id.*].   The contracts also contain the following substantially similar provisions that are common to all putative class members:   The contracts require that the contractor ensure his or her vehicle is roadworthy and make the vehicle available for DMC's inspection; the contractor insure the vehicle and its delivery contents; the contractor pay social security, unemployment premiums, payroll taxes, and workers' compensation coverage; the contractor wear an identification badge, adhere to a dress code, and undergo background checks; the contractor make deliveries on time and have his or her delivery performance monitored; the contractor comply with DMC policies; and the contractor not allow passengers in the vehicle without DMC's prior approval.   [Doc. 86 at 8, 17].   Because these contractual provisions are contained in seven "independent contractor" agreements that Defendant has conceded apply to all putative class members, the Court concludes that this evidence is common to all putative class members.

Plaintiffs also point to the common evidence of a memorandum issued by DMC to all employees that prescribes DMC's policy with respect to unscheduled breaks.   Michael W. Vargas, who worked as an alleged independent contractor, states in his affidavit that in about June 2011, Defendant "issued a memo to independent contractors and employees which directed, under threat of disciplinary action, that no unscheduled breaks, including bathroom breaks, were allowed unless pre-approved by Dispatch."   [Doc. 52-7, ¶ 10].   Defendant challenges that the evidence is common on the ground that Plaintiff Ernest Casias admitted that he never followed the memorandum, on the ground that Plaintiffs "do not even suggest the memo was provided to all contractors, nor do they assert that any particular group of contractors received the memo," and on the ground that the memorandum did not apply prior to its issuance in June 2011.   [Doc. 104 at 12].   Plaintiffs do not produce a copy of the memorandum.   Vargas, however, testified that Defendant "issued" the memorandum "to independent contractors and employees."   [Doc. 52-7, ¶ 10].   The Court concludes that this testimony constitutes evidence of a policy that Defendant provided to independent contractors company-wide, and that the evidence therefore is common to all putative class members.   That the memorandum was not followed by all employees does not negate the fact that the evidence indicates it was issued to all employees.   Likewise, that the memorandum was not in effect prior to June 2011 does not negate the fact that it is relevant to the question of whether Plaintiffs were employees covered under the Wage Act from June 2011 forward.

Plaintiffs also identify as relevant to their Wage Act claims (1) their own sworn written testimony, (2) the sworn written testimony of driver Michael Vargas, and (3) the sworn written testimony of driver Ernest Ulibarri.   Ulibarri and Vargas, with the exception of their testimony regarding the June 2011 memorandum, offer no evidence that they contend applies to all members

31

of the class; rather, they testify to facts that apply to them individually.   It is only Plaintiffs who purport that their own sworn testimony applies commonly to all class members.   The Court does not agree that Plaintiffs' affidavit testimony constitute common evidence.

Plaintiffs maintain in their affidavits that "Defendant DMC in its 'Independent Contractor Agreement' reserves the 'sole and exclusive right' 'to control the ways, means and manner of conducting its delivery services,'" but the agreements do not support the contention that the independent contractor agreements so provide.   To the contrary, the agreements provide that the "*Contractor*"—and not DMC—has at all times the sole and exclusive right . . . to control the ways, means and manner of conducting its delivery services."   [*See, e.g.*, Doc. 88 at 1, 10, 50 (emphasis added)].[8]   Thus, contrary to Plaintiffs' affidavit testimony, there is no common contractual evidence that DMC has the "sole and exclusive" right to control the manner of the putative class members' delivery services.

The remainder of Plaintiffs' affidavit testimony seeking to establish that DMC exerted control over the manner in which the putative class members conducted their delivery services is likewise insufficient to constitute common evidence.   Plaintiffs attest in their affidavits, for example, that "DMC requires Plaintiff to deliver and pick up packages at locations determined solely by Defendant," that "DMC controls the dispatch of the drivers' work each day," "DMC prescribes the hours of work of the independent contractor drivers," "DMC directs the independent contractors in the route to follow," "DMC sets the order and sequence of the deliveries of the independent contractors," "Plaintiffs do not decide their own work schedule," "DMC unilaterally requires drivers to follow Defendant's prescribed methods of delivery," "DMC requires

---

[8]   The agreements define the independent contractor signing the agreement as "Contractor" and define DMC as the "Company."   [Doc. 88 at 1, 10, 50].

compliance with strict time standards and notification standards," DMC requires "waiting at a location at the direction of Defendant," and "DMC employs a variety of managerial and supervisor employees who have supervisory responsibility over . . . drivers and their daily assignments."  [*Id.* at 8, 10, 11].  Plaintiffs also attest in their affidavits that, although the agreements grant the putative class members the right to hire back-up drivers and have sole responsibility for the direction, supervision, and control of these back-up drivers, other evidence contradicts this contractual right and establishes that DMC assumes direction, supervision, and control over these subcontractors.  [*Id.* at 9, 11].  Plaintiffs further attest that, although the independent contractor agreements provide that the contractors have the "right to refuse" any job, other evidence demonstrates that DMC requires the putative class members to take or pick up packages after the scheduled pick-ups or deliveries.  [*Id.* at 10, 12].

Although the Court has not engaged in a word-for-word comparison of Plaintiffs' affidavits, the affidavits appear to contain either identical or substantially identical language.  The affidavits also do not establish the facts underlying Plaintiffs' conclusory allegations regarding Defendant's asserted exercise of control.  Courts have declined to deem "common" the formulaic affidavit recitations of company actions that profess to apply to all putative class members.  These courts reason that affidavits containing identical, perfunctory language appear to be prepared by attorneys for litigation purposes and therefore do not constitute evidence sufficient to establish commonality.  *See, e.g.*, *Hampshire v. Port Arthur Indep. Sch. Dist.*, No. 06-CV-235, 2006 U.S. Dist. LEXIS 88874, at * 13-14 (E.D. Tex. Dec. 7, 2006) ("[T]he nearly identical statements in the affidavits that affiants have personal knowledge of other potential plaintiffs who are similarly situated are insufficient for the court to find that such plaintiffs exist"); *Palacios v. Boehringer Ingelheim Pharm., Inc.*, No. 10-22398-Civ-UU, 2011 WL 6794438, at *2 (S.D. Fla. Apr. 19, 2011)

(declining to consider "three almost identical, cut-and-paste declarations" purporting to establish common evidence); *Silverman v. SmithKline Beecham Corp.*, Nos. CV-06-7272-BSF and CV-07-2601-DSF, 2007 U.S. Dist. LEXIS 80030, at *5, 8 (C.D. Cal. Oct. 15, 2007); *id.* at *7 n.5 ("The Court strongly disapproves of the use of boilerplate attorney-drafted declarations" to establish that plaintiffs and putative class members are similarly situated.).   For these reasons, the Court likewise concludes the Plaintiffs' affidavits do not constitute evidence common to all putative class members.

More importantly, the Court declines to consider Plaintiffs' affidavit testimony "common" to all putative class members because Plaintiffs admit that their personal knowledge is limited to what they personally experienced at DMC's Albuquerque, New Mexico location and on what other Albuquerque contractors have told them.   [Doc. 104 at 11; Doc. 104-1 at 50, 53, 67; Doc. 104-2 at 42].   Furthermore, Plaintiffs concede that their knowledge is limited to the time they were under contract with DMC, which does not cover the entirety of the applicable statute of limitations period.   [Doc. 104 at 11; Doc. 104-1 at 50, 67; Doc. 104-2 at 26].   Thus, Plaintiffs' affidavit testimony is not common to all members of the New Mexico subclass and certainly is not common to all out-of-state putative class members.[9]

Rather, the Court concludes that the evidence that refutes the common contractual provisions—*i.e.*, the provisions indicating that the contractors had control over the "ways, means and manner" of providing their services, the right to hire and supervise their back-up drivers, and

---

[9]   The Court also discredits at least part of the affidavit testimony on a different ground. Defendant argues that to the extent that Plaintiffs' affidavit testimony is based upon what other Albuquerque contractors have told them, this testimony is hearsay.   Plaintiffs have failed to present any argument that the statements do not constitute hearsay or that they fall within an exception to the hearsay rule.   Thus, the Court concludes that Plaintiffs' affidavits do not constitute "common" evidence to the extent those affidavits are based upon what other Albuquerque contractors told them.

the right to refuse any job—is individualized.   As the court recognized in *Mike v. Safeco Insurance Co. of America*, 274 F. Supp. 2d 216 (D. Conn. 2003), a uniform job description cannot constitute evidence "common" to all putative class members when the employees seek to disavow the job description and instead show that their actual employment situations were contrary to the descriptions in the uniform policy.   *See id.* at 221 (acknowledging that claims representatives shared a common job description but holding that this was insufficient to satisfy the predominance requirement because the plaintiff "[did] not rely on the job description as evidence in support of his claim," but rather "expressly disavow[ed] th[e] job description" on the basis that it misrepresented claims representatives' duties as administrative and as falling within the FLSA's administrative exemption).   Plaintiffs present evidence attempting to show that Defendant *in* actuality exercised the control that the contracts grant to Plaintiffs.   Thus, as in *Mike v. Safeco*, the merits of Plaintiffs' claims turn on their day-to-day work and not upon any company-wide contractual policies.   *Cf. id.* (reasoning that, because the plaintiff presented evidence that his time was spent "performing non-administrative functions despite the fact that his job description calls for him to perform some administrative functions," the "merits of [the plaintiff's] claim will turn upon evidence relating to [the plaintiff's] day-to-day tasks, and not upon any . . . company policy or decision").

Moreover, Plaintiff's reply in support of their Motion to Certify highlights the individualized nature of the evidence in dispute and thus provides support for the Court's conclusion that the evidence establishing that Defendant actually exercised control over the ways, means, and manner of Plaintiffs' delivery services and the right to hire and supervise backup drivers is not common.   In their reply, Plaintiffs present evidence that they contend proves that Defendant exercised control over Plaintiffs by prescribing the hours of work, the route taken, and

the order and sequence of delivery.  Plaintiffs point to Ernest Casias' declaration testimony, which describes how he had to follow a daily schedule given to him on a manifest, how this manifest "dictates the times at which DMC requires [him] to appear at each delivery and pick-up point," and how the manifest "dictates a pickup time . . . and a delivery time . . . for every stop." [Doc. 108 at 20 (citing Doc. 52-1)].  Plaintiffs also identify the affidavit testimony of Linnie McClellen, former "independent contractor" driver for Defendant, which provides that "DMC controlled every aspect of [her] work including time of pick up, time of delivery, timely confirmation calls, the order of delivery and pick up," as well as, presumably pursuant to contract, the "security measures for cargo, ability to take riders and pets in [her] own vehicle," and other measures.  [*Id.*].  Plaintiffs also point to Michael Vargas's testimony in his affidavit that both as a "subcontractor" and as an "independent contractor" DMC would monitor his arrival times, break times and time at every stop."  [*Id.* (citing Doc. 52-7)].  Vargas testified that as a subcontractor for "independent contractor" Mark L'Esperance, "DMC Dispatch . . . would direct [him] in every aspect of [his] job" and that "[s]ometimes [he] would go weeks without talking to Mark but [DMC] Dispatch would telephone [him] several times during the day to direct [him] in pick-ups and deliveries, to keep track of where [he] was, to make sure [he] was following arrival times, break times and time at every stop."  [*Id.*].  With the exception of the contractually-designated cargo security measures and prohibition against taking riders and pets in a vehicle, the foregoing testimony is individualized and applicable only to the persons providing the testimony.  None of the testimony indicates that DMC had any company-wide policy or practice of controlling the ways, means, or manner in which the alleged independent contractors provided their services.

Plaintiffs also identify evidence in their Reply that contradicts the contractual provision

granting the contractors had the right to hire and control their back-up drivers.   This evidence is also individualized.   In their Reply, Plaintiffs point out that they allege in their Complaint that DMC does not allow its so-called "independent contractor" drivers to hire back-up drivers or to supervise or direct their back-up drivers, but they do not present any evidence that this is a company-wide policy of DMC's.   [Doc. 108 at 11].   Rather, with the exception of Plaintiffs' affidavit testimony, which this Court already has declined to consider common, Plaintiffs support this contention with individualized evidence.   Plaintiffs identify the affidavit testimony of Mark L'Esperance, a former "independent contractor" driver of DMC, who attests as to his experience with DMC and its position on "back-up drivers."   [Doc. 108 at 12].   L'Esperance asserts that "in theory" he was allowed to hire his own back-up drivers, but "in reality, the company usually selected the drivers it wanted me to hire" using its ability to fire L'Esperance as leverage to achieve the result it wanted.   [*Id.* (citing Doc. 108-1 at 3)].   L'Esperance also testified that DMC often converted his back-up drivers to its own independent contractor.   [*Id.*].   Linnie McClellan likewise testified in an affidavit that McClellan was called an independent contractor but that DMC would "fully direct [McClellan's] subcontractors as if they were employees," and that in one instance DMC fired McClellan's subcontractor/back-up driver.   [Doc. 108 at 12 (citing Doc. 108-1 at 5)].   Michael Vargas, former DMC employee, turned back-up driver, and then turned independent contractor, testified that when he was working as a back-up driver, *i.e.*, an employee of one of DMC's "independent contractors," DMC nonetheless treated him as its own employee by directing and supervising his work.   [Doc. 108 at 12-13 (citing Doc. 52-7)].   Vargas testified that when he was a back-up driver DMC treated him the same as it treated him when he was DMC's employee.   [Doc. 108 at 13].   Plaintiff Ernest Casias testified in his deposition that DMC required his back-up drivers to report directly to DMC, and that DMC essentially directed and

controlled his back-up drivers in their day-to-day operations.   [Doc. 108 at 14 (citing Doc. 104-1).

Plaintiff Andrew Casias testified that even when he was the subcontractor of one of DMC's

alleged independent contractors, Casias had to have an independent contractor agreement directly

with DMC.   [Doc. 108 at 15 (citing Doc. 104-2)].   Although all of this testimony is similar in its

substance, it is not presented in the form of a uniform, company-wide policy.   Rather, each person

is testifying to his or her own individual experience with DMC.   Thus, the evidence is not

common.

Finally, the reply presents evidence that Defendant required at least some contractors to

wait at customer sites in between scheduled deliveries and at DMC's Albuquerque facility for the

benefit of DMC.   For example, Plaintiffs point to the affidavit testimony of Ernest Ulibarri

indicating that "DMC would treat [him] as an employee by requiring [him] to wait at the DMC

facilities 3-4 hours while DMC followed road conditions" to determine whether to cancel a

driver's deliveries.   [Doc. 108 at 15 (citing Doc. No. 52-6)].   "DMC did not allow [Ulibarri] to go

home to wait for a phone call to tell [him] whether or not to drive the route that day."   [*Id.*].   At

his deposition, Ulibarri testified that DMC dispatcher operators instructed him to remain in wait at

the customer delivery site and told him that he was not able to do what he wanted during this

two-hour wait time between deliveries.   [*Id.* (citing Doc. 104-4)].   Plaintiffs point out that

Michael Vargas testified that during his ten to fifteen minute wait time between deliveries he had

to wait where instructed by DMC and that he was not able to do anything on his own.   [*Id.* (citing

Doc. 104-3)].   Plaintiff Ernest Casias testified at his deposition that DMC required him to wait in

the area at DMC's instruction.   [*Id.*].   Ernest Casias testified that he was "required to stay there

and to address all the on-calls and be ready for them to have an on-call for you to pick up.   If you

needed to leave the area, you had to call and get permission."   [*Id.* (citing Doc. 104-1)].   Ernest

Casias also testified that a DMC manager and DMC dispatch operator required him to stay within the vicinity of his last stop on his Tucumcari route.   [*Id.* (citing Doc. 104-1)].   Andrew Casias testified that he was not able to do what he wanted during the time between deliveries, but rather "we were required to stay there, because re receive on-calls. . . .   We're not free to do whatever we want, because we have to pick it up."   [*Id.* (citing Doc. 104-2)].   Andrew Casias further testified that "we really couldn't do anything" "personal" during the wait time, that he did not do anything personal during that time, except get lunch, and that he would stay in the parking lot of the location of his customer site and wait to hear from DMC.   [*Id.* (citing Doc. 104-2)].   None of the testimony regarding wait time indicates that DMC had a company-wide policy regarding wait time or that it otherwise had a uniform practice that applied commonly to all putative class members. Rather, each person testified to a different experience with DMC.   For example, while Ulibari and Andrew Casias testified they had to remain in wait at their customer sites, Ernest Casias testified that he only had to wait in the area.   Thus, the Court concludes that the evidence Plaintiffs point to regarding wait time is individualized.

Defendant also identifies other evidence that is individualized.   For example, although Ernest and Andrew Casias' interrogatory answers claim that DMC required compliance with strict time standards, [Doc. 86 at 8, 10], Ernest Casias testified at his deposition that he regularly finished two of his three routes several hours early despite the scheduled times.   [Doc. 104 at 19 (citing Doc. 104-1 at 20-21, 23)].   Further, regarding wait time, Defendant points out that Ernest Casias testified that there was no alleged waiting time on two of his three routes and that he could leave to eat lunch, "once in awhile" wait at the park, or on one occasion conduct a vehicle transaction.   [Doc. 104 at 19 (citing Doc. 104-1)].   Defendant also points out that the evidence indicates that neither Andrew nor Ernest Casias knew what other contractors did during their wait

time, if any.   [Doc. 104 at 19 (citing Docs. 104-2 at 51-52; 104-1 at 75)].

Having reviewed the evidence, the Court next considers, as Rule 23(b)(3) instructs, whether "the questions of law or fact common to class members predominate over any questions affecting only individual members."   Fed. R. Civ. P. 23(b)(3).   The common evidence is limited to the contractual provisions in the independent contractor agreements and the June 2011 memorandum requiring the putative class members to obtain advance approval for any breaks. The Court holds that this common evidence does not predominate over the individualized evidence.   The common contractual evidence constitutes only a single factor under the economic realities test and does not describe the "total employment situation"[10] of a putative class member. *Cf. In re FedEx Ground Package Sys., Inc., Employment Practices Litig.*, 273 F.R.D. 499, 513 (N.D. Ind. 2010) (holding that although the company FedEx had a uniform operating agreement, policies and procedures, and consistent practices, the individualized evidence predominates because, under the economic realities test "no single factor is controlling and the court may consider different factors as each individual case requires, including actual exercise of control," and as a result "the court simply cannot determine based on the evidence presented by the plaintiffs that all the class members should be treated alike; their experiences with [the employer FedEx] will differ from terminal to terminal and driver to driver").   Moreover, to the extent the contract also contains provisions relevant to the question of control, Plaintiffs rely only on some of those provisions to establish that Defendant had the right to control, whereas Plaintiffs seek to disavow (through individualized evidence) other provisions which indicate that Plaintiffs had the right to control.   The Court concludes that the evidence necessary to establish actual control—and not

---

[10]   *Garcia v. Am. Furniture Co.*, 689 P.2d 934, 938 (N.M. Ct. App. 1984) (internal quotation marks and citation omitted).

simply the right to control—is individualized, and that this evidence overwhelms the common evidence.   Thus, common questions do not predominate.

The Court's holding is consistent with the reasoning of the *Wells Fargo*, *Vinole*, and *Damassia* courts.   In *Wells Fargo* and *Vinole*, the Ninth Circuit defined the relevant inquiry as whether the evidence demonstrates that the "employer exercised some level of centralized control in the form of standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs, and other factors susceptible to common proof," *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009), or whether the claims before the court will be proved by individualized inquiries into the circumstances of each employee, *see id.* at 946-47.   In both of these cases, the Ninth Circuit held that individualized inquiries predominated.   The court reasoned that the issue before the court required it to examine whether the putative class members were subject to the FLSA's outside salesperson exemption because they "customarily" and "regularly" were away from their place of business, and this inquiry involved an examination of "where the individual employees *actually* spent their time."   *In re Wells Fargo Home Mortgage Overtime Pay Litigation*, 571 F.3d 953, 959 (9th Cir. 2009); *see also Vinole*, 571 F.3d at 947.   In contrast, the *Damassia* court held that common issues predominated because the question whether the FLSA's administrative exemption applied could be answered by consulting uniformly-applied comprehensive corporate procedures and policies.   *See Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 160-61 (S.D.N.Y. 2008).

In this case, unlike *Damassia*, the question whether the putative class members were employees under the economic realities test or whether they were subject to the piecework exemption cannot be answered by examining predominantly common proof.   The common evidence of the contractual provisions and the June 2011 memorandum at issue here are not

41

comparable to the highly uniform, centralized, and standardized company-wide policies at issue in *Damassia*. While the shared contractual provisions suggest that Defendant had a common approach to contracting with the alleged "independent contractor" drivers, they do not reflect a uniform and standardized policy issued by a company with highly centralized management. *Cf. id.* at 159, 161. To the contrary, Plaintiffs present individualized testimony that disavows several of the contractual provisions, which provides support for the conclusion that the contracts are not uniformly applied and therefore not akin to the policies at issue in *Damassia*. *Cf. Mike v. Safeco Insurance Co. of America*, 274 F. Supp. 2d 216, 221 (D. Conn. 2003). Furthermore, the evidence relevant to whether Defendant altered the piecework compensation structure and removed the putative class members from the piecework exemption is contained in no contractual provisions or company-wide policies.

Rather, like the *Wells Fargo* and *Vinole* courts, this Court must examine the individual circumstances of each putative class member and determine how each member, in actuality, interacted with DMC on the questions of control, back-up drivers, and wait time. *Cf. Wells Fargo*, 571 F.3d at 959; *Vinole*, 571 F.3d at 947. That this case does not lend itself to common proof is in part attributable to the nature of the inquiry before the Court. *See Wells Fargo*, 571 F.3d at 959 (explaining that the nature of some exemptions "often . . . will militate against certification because . . . [they] require[] a fact-intensive inquiry into each potential plaintiff's employment situation"). The economic realities test seeks to determine an employee's *actual* economic *reality* vis-a-vis his or her employer and is not based upon an employee's theoretical rights or obligations under a contract. *Cf. FedEx*, 273 F.R.D. at 513 (explaining that a court should not look solely to a contractual right to control because a contract is only one factor to consider under the test, and holding that the court must examine the "control actually exercised"

because "[t]he economic realities test is not a matter of terminology . . . but of the realities of the work performed") (internal quotation marks and citation omitted).   The New Mexico Court of Appeals has emphasized that to determine the economic reality of a particular worker, the ultimate issue requires consideration of the "'total employment situation.'"   *Garcia v. Am. Furniture Co.*, 689 P.2d 934, 938 (N.M. Ct. App. 1984) (quoting *Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1189 (5th Cir. 1979)).   This implies that a court must consider more than a worker's abstract rights or obligations under a contract.   Indeed, the New Mexico Court of Appeals has held that a contract is only one of four factors to consider under the economic realities test.   *See id.* Moreover, the Tenth Circuit has confirmed that "[t]he 'economic realities' test seeks to look past technical, common-law concepts of the master and servant relationship to determine whether, as a matter of economic *reality*, a worker is dependent on a given employer."   *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 506 (10th Cir. 2012) (emphasis added) (citation omitted).   This inquiry cannot be undertaken based solely upon examination of the contracts.   *Cf. Baker,* 137 F.3d at 1440 ("None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach.").

The *Wells Fargo* and *Vinole* courts emphasized that when—as here—the dispute at issue requires a court to delve into the actual day-to-day activities of the worker, individualized questions will likely predominate.   *See Wells Fargo*, 571 F.3d at 959; *Vinole*, 571 F.3d at 947. The exemption policy at issue in *Wells Fargo* and *Vinole* was the federal outside salesperson exemption, which applies where, among other things, the employee is "customarily and regularly away from the employer's" place of business.   29 C.F.R. § 541.500(a)).   The *Wells Fargo* and *Vinole* courts held that this exemption does not lend itself to common proof because "it requires a fact-intensive inquiry into each potential plaintiff's employment situation."   *Wells Fargo,* 571

43

F.3d at 959 (internal quotation marks and citation omitted); *see Vinole*, 571 F.3d at 947.   The economic realities test, even more than the outside salesperson exemption, requires examination into each potential plaintiff's employment situation, because the economic realities inquiry specifically examines the *factual reality* of the worker.

For the foregoing reasons, the Court concludes that the individualized evidence of each potential class member's experience with DMC on the questions of control, supervision, wait time, and back-up drivers will predominate over the common evidence contained in the individual contractor agreements and the June 2011 memorandum.   Thus, the Court holds that Plaintiffs have failed to satisfy the predominance requirement of Rule 23(b)(3).[11]

2.     Rule 23(b)(1) and (b)(2).

To carry their burden and prevail on their Motion to Certify, Plaintiffs must satisfy at least one of the three requirements of Rule 23(b).   *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).   Plaintiffs argue that they have satisfied all three of the requirements of Rule 23(b).   The Court already has concluded that Plaintiffs have not satisfied the predominance component of subsection (3) of Rule 23(b).   The Court now considers whether Plaintiffs can nonetheless comply with Rule 23(b) by satisfying the requirements of either subsections (1) or (2) of that rule.

While Plaintiffs develop a substantive argument regarding the requirements of Rule 23(b)(3), Plaintiffs' sole reference to the requirements of Rule 23(b)(1) and (b)(2) can be found on one-half of a page in their opening brief.   Plaintiffs argue that they satisfy Rule 23(b)(1)(B)

---

[11]   The Court's holding that Plaintiffs' have failed to satisfy the predominance requirement is dispositive.   The Court therefore need not and does not decide the questions whether the individualized nature of damages or the amount of overtime worked is inconsistent with class treatment under Rule 23(b)(3), or whether legal issues predominate because out-of-state class members are covered by wage acts in other states and not by the New Mexico Wage Act.

because

> adjudications with respect to individual class members could, as a practical matter, be dispositive of the interests of the other members who were not parties.  This could substantially impair or impede the non-parties' ability to protect their interests if Defendant prevailed in an early trial against one of the Plaintiffs and then argued that the determination of independent contractor/employee were binding upon other members of the class.

[Doc. 86 at 25].  Plaintiffs also argue that they could satisfy Rule 23(b)(2) because "a final injunctive relief or corresponding declaratory relief would be appropriate with respect to the class as a whole since Defendant has acted based upon an 'independent contractor' agreement that is applicable to each member of the class."  [*Id.*].  Defendant contends that Plaintiffs have failed to satisfy their burden of clearly satisfying the requirements of Rule 23(b)(1) or (b)(2).  *See Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

Rule 23(b)(1) provides that

> prosecuting separate actions by or against individual class members would create a risk of:
>
> (A)  inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> (B)  adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

Fed. R. Civ. P. 23(b)(1).  Courts should confine class certification under Rule 23(b)(1) to those causes of action in which there is a total absence of individual issues.  *See McHan v. Grandbouche*, 99 F.R.D. 260, 266 (D. Kan. 1983) (citing *In re Home-Stake Prod. Co. Secs. Litig.*, 76 F.R.D. 351, 376 (N.D. Okla. 1977); *Tober v. Charnita, Inc.*, 58 F.R.D. 74, 81 (M.D. Pa. 1973);

45

3B *Moore's Federal Practice* ¶ 23.35[1], p. 23-270).   The reasoning behind this rule is that "the presence of individual issues[] . . . renders the class unsuitable for (b)(1) classification because the need to litigate individual issues prevents the possibility of varying adjudications which might establish incompatible standards of conduct."   *Id.*

The Court already has held that the question whether the Wage Act applies cannot be resolved by common proof and that the inquiry requires individualized proof.   This precludes any finding that varying adjudications would create incompatible standards of conduct for Defendant. Thus, the Court rejects Plaintiffs' argument that they have affirmatively demonstrated that they have satisfied the prerequisites of Rule 23(b)(1).

The Court likewise is not persuaded by Plaintiffs' argument that they have affirmatively demonstrated that they have satisfied Rule 23(b)(2)'s prerequisites.   Subsection (b)(2) provides that "the party opposing the class has acted or refused to act *on the grounds that apply generally to the class*, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."   Fed. R. Civ. P. 23(b)(2) (emphasis added).   The Supreme Court of the United States has held that the language "on grounds that apply generally to the class" means, "at a minimum, [that] claims for *individualized* relief (like . . . backpay . . . ) do not satisfy the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011).   The Supreme Court has explained, "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."   *Id.* (internal quotations and citation omitted). According to the Supreme Court, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.   It does not authorize class certification when each individual class member would be entitled to a *different* injunction or

46

declaratory judgment [or] when each class member would be entitled to an individualized award of monetary damages." *Id.*

Here, Plaintiffs cannot establish, as required by the language of Rule 23(b)(2), that Defendant has "acted or refused to act on the *grounds that apply generally to the class*." Fed. R. Civ. P. 23(b)(2). The Court already has explained that whether Defendant misclassified any given putative class member requires an individualized inquiry into the economic reality of the putative class member's actual working relationship with Defendant. Likewise, whether Defendant altered the piecework compensation structure with respect to a given driver requires an individualized inquiry into the time each driver spent waiting between deliveries for Defendant's benefit. Under Rule 23(b)(2), the nature of the injunctive or declaratory relief must be indivisible, such that the conduct can be enjoined or declared unlawful only as to all of the class members, or alternatively, as to none of the class members. *See id.* Here, the decision whether Defendant misclassified an individual driver or altered the piecework compensation structure with respect to that driver will not be uniform amongst the entire class. Rather, the Court must engage in an individualized evaluation of each driver's economic reality and each driver's time spent waiting. This individualized inquiry precludes a finding that Plaintiffs have satisfied the requirements of Rule 23(b)(2).[12]

---

[12]  To satisfy subsection (b)(2), Plaintiffs also must establish that monetary damages are incidental. In their complaint, Plaintiffs seek an award of monetary damages, [Doc. 1-2 at 22], as well as declaratory and injunctive relief, [*id.*, ¶¶ 65, 67]. Plaintiffs asks the Court to certify a hybrid class pursuant to Rule 23(b)(3) for monetary damages and pursuant to Rule 23(b)(2) for equitable relief. [*Id.* ¶ 66]. When a plaintiff seeks money damages, but also requests certification of a class pursuant to Rule 23(b)(2), which applies only to injunctive and declaratory relief, the plaintiff can satisfy the requirements of Rule 23(b)(2) only if the monetary relief is incidental. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011) (holding that monetary damages cannot be certified under Rule 23(b)(2), "at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief"). Although the Court doubts that

Plaintiffs have failed to comply with Rule 23(b) by satisfying the prerequisites of any one of the three types of class actions identified in that rule.   Because this showing is mandatory, the Court denies Plaintiffs' Motion to Certify on this ground.   The Court's holding is dispositive. The Court therefore does not determine whether Plaintiffs have satisfied their burden of affirmatively demonstrating that they have met the requirements of Rule 23(a).

## CONCLUSION

For the foregoing reasons, IT THEREFORE IS ORDERED that Defendant's Motion to Strike Affidavits Filed in Support of Plaintiffs' Reply Brief [Doc. 111] is DENIED, Defendant's Motion for Leave to File a Rebuttal to Plaintiffs' Supplemental Reply [Doc. 120] is DENIED, and Plaintiffs' Motion for Class Certification and Memorandum in Support Thereof [Doc. 86] is DENIED.

Dated this 31st day of March, 2014.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE

---

Plaintiffs can affirmatively demonstrate that their monetary claims are incidental, the Court holds that Plaintiffs have failed to comply with Rule 23(b)(2) on the alternative ground that the claims of the putative class members are individualized and therefore not proper for class treatment under Subsection (b)(2).   Thus the Court need not and does not determine whether monetary damages are incidental.